AYLING, (TOWN OF WEYANWEGAN v.)
See Case No. 17,473.

---

## Case No. 687.

### AYLWARD v. SMITH.

Circuit Court, D. Massachusetts. Oct. Term, 1873.

[Affirming Aylward v. Smith, Case No. 688. Cited in Choate v. Meredith. Id. 2,692. Nowhere reported; opinion not now accessible.]

---

## Case No. 688.

### AYLWARD v. SMITH.

[2 Low. 192.] [1]

District Court, D. Massachusetts. Dec., 1872.[2]

DEMURRAGE—LAY DAYS—ARRIVAL OF VESSEL.

Under the usual bill of lading, the lay days do not begin to run until the vessel has arrived at her place of discharge, and is ready to be unloaded.

[Cited in Gronstadt v. Witthoff, 15 Fed. 268; Fish v. One Hundred and Fifty Tons Brown Stone, 20 Fed. 202; The Henry Sutton, 26 Fed. 926; Manson v. New York, N. H. & H. R. Co., 31 Fed. 299.]

In admiralty. Demurrage.—Libel, by [James E. Aylward] the master of schooner Sandalphon, [against Martin L. Smith,] alleging that, on the seventh day of December, 1872, the Hoboken Coal Company shipped on board his vessel, then lying at Hoboken, in New Jersey, a cargo of coal, to be delivered to the respondent at Cambridgeport, Mass., for a certain freight, and the libellant signed a bill of lading therefor; that he proceeded on his voyage, and arrived at the wharf of the respondent on the 20th of December, and was detained there, by the respondent's neglect and fault, for twenty-seven days beyond the time allowed for discharging cargo by the contract between the parties. It appeared that the schooner was towed to the respondent's wharf in the afternoon of the 20th December, at about high tide; and was made fast outside of another vessel which

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

[2] [Affirmed by circuit court in Aylward v. Smith, Case No. 687.]

---

was in the berth. This other vessel was hauled out on the next day; but the libellant's schooner was then hard aground, and so remained for some days, the tides being lower than usual. Afterwards, the ice made round her, and she could not be hauled in until the 18th of January, when the cargo was discharged in less than two days. The libel stated the distance of the schooner from the wharf to be thirty-five feet; and the evidence was somewhat conflicting as to the exact distance, the respondent maintaining that it was considerably greater. Both parties did what they could to break the ice and to haul in the vessel. On the 28th of December, the deck load of twenty tons was delivered by means of a staging or bridge; and it was alleged that more might have been landed in this way; but the respondents testified that the bridge was so slippery and dangerous that it was impracticable to use it further. The bill of lading contained these words: "Usual dem. after three days, Sundays exc." It was agreed that this meant that the usual demurrage of eight cents per ton for each ton of the cargo was to be paid for every day the vessel should be detained beyond three days, exclusive of Sundays. The libellant demanded demurrage at this rate for twenty-seven days. [Libel dismissed. Decree affirmed in Aylward v. Smith, Case No. 687.]

C. F. Walcott, for the libellant, cited Abb. Shipp. (11th Ed.) 271; Brown v. Johnson, 10 Mees. & W. 331.

T. H. Russell, for respondent.

LOWELL, District Judge. It does not appear to me that the unfortunate delay in discharging this schooner arose from any fault on either side. I cannot agree that the defendant is responsible for the position which the master took up for his vessel while waiting his turn to unload. There was no hidden danger at that place of which warning should be given to strangers; and no notice was given by the master of his purpose to put the vessel there; no questions were asked or answered about depth of water, draft, or any thing else. The schooner lay in a place to which a tug master, well acquainted with the navigation, had taken her, and where she might well enough have awaited her turn at the dock if the accidental change of tides, caused by a change of wind, had not come on the next day, and if extreme cold weather had not set in at the same time.

It seems to be thought that a person who has a wharf with only enough water at ordinary times, and liable to be deficient on extraordinary occasions, or a wharf to which navigation is somewhat difficult or intricate, ought to be held to warrant the safe approach of all vessels that are navigated with ordinary care and skill; but I know of no such law. There was, as I have already ob-

served, nothing said about the draft of the schooner, no deception, nothing to raise an inference that either party had any thought on this subject. The contract was to carry the cargo to Cambridgeport; and both parties treated this as meaning the defendant's wharf in that port, as no doubt it did; but there was no absolute engagement on either part that the schooner should be able to reach the wharf in any particular time. The defendant did not engage, either expressly or by implication, that a berth should be always open for the libellant, whenever he should arrive. Any such implication would be most unreasonable, considering the uncertainties and delays that attend the navigation of sailing-vessels. And the bill of lading, in giving three days to clear the vessel, when the actual delivery of the cargo would take about half that time, appears intended to make allowance for some possible detention of this kind. Nor is there any ground for saying that the defendant could have taken out any more coal than the deck load in the mode in which that was taken, or that the master asked him to do so.

Neither party being in fault, the loss must fall on the plaintiff if his voyage was not ended and the lay days begun; otherwise, on the defendant. A voyage of this kind is usually considered to be ended, as between the ship-owner and the freighter, when the ship has arrived at the place of discharge, such as the public dock, although not able to get a berth immediately: Brown v. Johnson, 10 Mees. & W. 331. It is upon this rule that the plaintiff relies. He says that he arrived at the wharf on the 20th of December, reported to the defendant, and ended his voyage. This argument is specious; but it assumes that the vessel had arrived at the dock or wharf, when, in truth, she had only very nearly arrived. It has been held in two English cases, concerning cargoes of coals shipped under contracts almost identical with this, that delays within the port for a considerable time, owing to a want of sufficient water at the place of delivery would not require the freighter to receive the coals at another place, or cause the lay days to begin, though the contract had the clause that the ship was to go only so near to the place as she could safely get. It was held that, although she could not safely go up while the tides were neap, yet that was one of the accidents of navigation which a vessel contracting to go to a tidal harbor ran the risk of: Parker v. Winlow, 7 El. & Bl. 942; Bastifell v. Lloyd, 1 Hurl. & C. 388. The distance at which the ship is kept from her berth by the low water is immaterial, if it be so far that the delivery of the cargo is prevented. Upon this point, which is chiefly one of fact, I hold that the vessel had not arrived.

Then, if the vessel is to earn demurrage, she must not only arrive, but be ready to deliver her cargo; and that readiness must continue at least during the three days which the contract gives to the consignee. If the acts of the master on the first day are looked upon as a sort of tender of his cargo, it is one of the essential qualities of a tender that it should be continuing. Thus, where freight was to be paid in three days after arrival, "and before delivering of any part of the cargo," and the vessel arrived, and on the next day the cargo was destroyed by fire and water, it was held that the freight was not earned, because it was implied in the contract that the vessel should be able to deliver the cargo at any time during the three days: Duthie v. Hilton, 38 Law J. C. P. 93, L. R. 4 C. P. 138. I have seen no American case so nearly analogous to this as those which I have cited from the English reports, though I have no doubt the law is the same in both countries. Upon the whole, I find that the libellant has not made out that his lay days had begun when this delay occurred, nor that it was caused by any default of the respondent. The result is, that the libel must be dismissed, with costs. Libel dismissed.