SLEEPER (JONES v.). See Case No. 7,496.

SLEEPER v. PING. See Cases Nos. 12,940 and 12,941.

---

### Case No. 12,940.

SLEEPER et al. v. PUIG et al.

[10 Ben. 181.][1]

District Court, S. D. New York. Dec., 1878.[2]

SHIPPING — CHARTER — DEMURRAGE — DISPATCH — EXPENSE OF DISCHARGE—COMMISSION ON ADVANCES.

1. Where a vessel is to have "dispatch for discharging," the time to be allowed is meas-

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]
[2] [Affirmed in 10 Wall. (77 U. S.) 15.]

---

[1] [Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 12,941.]

ured by the capacity of the vessel to deliver the cargo.

2. Under a charter containing such a clause a vessel arrived at Havana with a cargo of paving stones, which, by the rules of the port, were to be discharged at the mole. Her master reported to the consignees on April 4, but, by reason of its being Passion Week and the crowded state of the mole, she was not brought up to the mole till April 14, when she was moored bows on, and the stones discharged on a staging. The master could have discharged the cargo over the side of his vessel in five days, but, in consequence of discharging over the bow and of custom house regulations as to discharging, the vessel was not discharged till April 24th. The master of the vessel claimed demurrage and that some errors in the vessel's account should be corrected, which was refused by the consignees, and the vessel remained in port pending this dispute till May 3d: *Held*, that the vessel was not entitled to demurrage after the discharge was completed.

[Cited in O'Rourke v. Tons of Coal, 1 Fed. 621; Gronstadt v. Witthoff, 15 Fed. 268.]

3. The vessel was entitled to demurrage for all the time after she was reported till she was discharged, less five days.

4. The vessel was not chargeable with the expense of the staging or extra expenses caused by discharging over the bow, because the charter agreed that the cargo should be received within reach of the vessel's tackles.

5. The consignees, having made an advance to the master which by the charter was to be free of commission, could not claim a commission on it by reason of their having made the advance before they were required to do so.

[This was a libel by Henry J. Sleeper and others against Emilio Puig and Santiago Puig.]

Beebe, Wilcox & Hobbs, for libellants.
Coudert Bros., for respondents.

CHOATE, District Judge. This is a libel by ship-owners to recover demurrage and a balance due under the charter party from the charterers. The charter was for a voyage from New York to Santa Cruz (Canary Islands) and thence to Havana, Cuba, to carry from Santa Cruz to Havana "a cargo of stone or other lawful merchandise." The freight was to be $4,000, gold, for the round voyage and the vessel's port charges at Canary Islands, "one-half payable on discharge of cargo at Santa Cruz in cash or in approved sixty days bills of exchange on London at $4.84 to the £ sterling, charterers' option, balance on delivery of cargo at Havana, free of all commissions." The clause relating to demurrage was as follows (words in italics being printed): *"It is further agreed that the said party of the second part shall be allowed for the loading and discharging of said vessel,* dispatch for loading at New York and discharging at Havana, thirty running days for discharging and loading at Santa Cruz. *And in case the vessel is longer detained by said party of the second part, or their agents, demurrage is to be paid the vessel's agent at the rate of* thirty-five *silver dollars per day, for every day so detained."* This charter also provided that the "cargoes shall be delivered and received alongside within reach of the vessel's tackles."

The vessel having proceeded to Santa Cruz and there taken on board a cargo of paving stones, arrived at Havana on the 2d of April. On the 4th of April the master entered his vessel at the custom house and reported to the consignees, the charterers' agents. The rules of the port required that cargoes, such as this, should be discharged at the mole. The vessel having arrived during Passion Week, the charterers claim that they are excused from getting her a berth or proceeding with the work of discharging the ship till April 9th, and in consequence of the crowded state of the mole she was not brought up to the mole till the 14th. At the mole she was moored bow on, and at such a distance that, in order to discharge the cargo, it was necessary to build a staging from the hatchway forward to the bow, along which the stones were carried on trucks and then they were slid down an incline to the mole, where the consignees received them. The discharge was not completed till the 24th of April. It is proved that the master could, with the force at his command, have delivered the cargo over the side of his vessel in five days, but in consequence of delays in receiving the cargo on the part of the consignees, and the regulations of the custom house which forbade the discharge of cargo before nine in the forenoon without a special permit, and after two in the afternoon without a special permit, and in consequence of the neglect of the consignees to obtain such permit till several days after the discharge of the cargo commenced, the discharge was protracted as above stated till the 24th of April. After the discharge of the cargo, a misunderstanding arose between the master and the consignees as to the settlement of the ship's account, the master claiming demurrage and insisting on the correction of several alleged errors in the account. After several interviews, which did not result in an agreement, the master received the balance admitted by the consignees to be due to the ship, but without consenting to the correctness of the account, and sailed on the 3d of May. The delay in sailing from April 24th to May 3d was wholly by reason of this dispute. The libellants claim demurrage for twenty-three days from April 4th, to May 2d, allowing five days as a proper time for discharging the cargo.

As to the delay while the cargo was being discharged between April 14th, and April 24th, it is clear that they are entitled to five days' demurrage. The term "dispatch," means "without delay." It does not mean "with diligence," nor does it refer to, nor is it controlled by, any usages, customs or rules of the port. It is a term that does not need construction by reference to extrinsic circumstances. A charterer, who stipulates for dispatch in discharge, takes all risks of being able to effect such discharge; and though without his fault, as by reason of stress of weather, ice, the impossibility of obtaining the necessary hands to receive the cargo, or

other cause, he is obliged to detain the ship, he must pay the stipulated demurrage. The time allowed by this phrase for receiving the cargo is measured by the capacity of the ship to deliver it. This is well settled by authority. Davis v. Wallace [Case No. 3,-657]; Kearon v. Pearson, 7 Hurl. & N. 386. The libellants are therefore entitled to five days' demurrage on account of the delay after the discharge commenced. As to the delay from the 24th of April to the 2d of May, it appears not to be within the stipulation of the charter party as to demurrage. The ship was not during this period detained by the consignees but by the master himself. It was not a delay in discharging for which demurrage is agreed to be paid. If the master thinks it for the interest of his owners to stay in port for the purpose of settling a dispute with the consignees, he may properly do so, but I do not see how he can charge the damage caused by the loss of time in the use of the ship to the consignees as demurrage. If the consignees refuse to pay a balance due to the ship, the owners can recover interest from the time it became due and should have been paid, but the voyage is ended, and there can be no demurrage for such delay. It did not appear that the master was unable to sail by reason of the refusal of the consignees to settle the ship's account. What might be the effect of such inability is not now in question.

Whether the charterers are liable for demurrage between the 4th of April, when the ship arrived at her anchorage, and the 14th of April, when she was moored at the mole, is a more difficult question. It has been said that "lay days by the general rule do not commence until the vessel has arrived at the usual place for unloading." 1 Pars. Shipp. & Adm. 313. But this does not necessarily mean the very place where the cargo is to be discharged, although it is doubtless the duty of the master, where no place of discharge is designated, to proceed to the place to be designated by the consignee or charterer, provided it be a usual and proper place for discharge within the port of destination. Brown v. Johnson, 10 Mees. & W. 331. Thus in the case last cited where by the charter the voyage was to London with a cargo usually discharged in the docks, it was held that the lay days commenced with the arrival of the ship in the docks and not from the time of her arrival at the particular place in the docks where she was to discharge. This question of delay between arrival in the port and arrival at the place of discharge was touched upon in Davis v. Wallace, supra, but not decided, the court having found that the delay was acquiesced in by the master, which precluded the claim for demurrage; but, from the claim being dismissed on this ground, it may perhaps be inferred from the opinion that such delay if unexcused is a proper subject for demurrage. In the present case the vessel appears to have been brought into the usual place of anchorage near the mole, where vessels await their return for discharging at the mole. The consignees evidently assumed the entire control of the matter of finding a place for the discharge of the cargo. They thereby affirmed their duty under the contract, as they understood it, to take charge of the ship. It is evident that a delay in finding a place to discharge is as much within the mischiefs sought to be obviated by the requirement of "dispatch for discharging" in the charter party as a delay in receiving the cargo after the ship reached the wharf. I think upon the whole the case is within the rule laid down in Brown v. Johnson, supra, and that the charterers are liable for all delay from the time of the reporting of the vessel at her anchorage near the mole in readiness to deliver her cargo, and that the libellants are entitled to demurrage for fourteen days in all, allowing for one Sunday, which would have fallen within the period of the discharge if immediately commenced, and amounting to $490—silver money.

The consignees charged the ship a commission on advances of $42.25. This was in direct violation of the charter party and is not excused by the fact that the advance was made sooner than the charter party required. They might have refused to make the payment till required by the charter, but having made it they were bound by the stipulation that it should be free of all commissions.

The charges for building the staging to the bow, $37.10, for extra men in trucking cargo from the hatch to the bow, $68.00, and for two trucks for same service, $8.50, making in all $113.60, were improper, because it was agreed in the charter that the cargo should be delivered within reach of the ship's tackles and no part of this expense would have been necessary if it had been so delivered.

The expense of towage and pilotage to and from the mole appears to have been a proper charge against the ship. The expense was necessary to the delivery of the cargo. The fee of ten dollars paid as a gratification to a custom house officer is not shown to have been either necessary or proper and was improperly charged.

On the evidence there was an overcharge of five cents a ton for tonnage dues, amounting to $13.15, gold, and also an error in computing the value of eagles, amounting to $13.38, gold.

The above items for staging, fee to officer, extra men and trucks are computed in Spanish currency, which was to gold or silver as 240 to 100, and these items are therefore equivalent to....................$51 50, gold.
The other items are:

Demurrage ....................$490 00
Tonnage dues............... 13 15
Commissions ............... 42 25
Error in eagles............. 13 38
                            ————
Total ................$610 28

—For which sum, with interest from May 2,

1874, and costs, the libellants are entitled to a decree.

[On appeal to the circuit court, the decree of this court was affirmed, with costs. Case No. 12,941.]