GRONSTADT *v.* WITTHOFF.

(*District Court, S. D. New York.* February 8, 1883.)

1. SHIPPING—USAGE OF PORT—LANDING CARGO.
    In the absence of any different usage of the port, or other indication in the bill of lading, a vessel is bound to land her cargo at some suitable wharf.
2. SAME—BILLS OF LADING—HOW CONSTRUED.
    Bills of lading, like other commercial instruments, when indefinite in their terms, are to be construed reasonably according to the presumed intention to be gathered from the situation of the parties, and their relations to the ship

and to each other; they should not be construed, unnecessarily, so as to make different consignees responsible for each other's faults, nor for delays of the vessel, if they have no control of her movements or in selecting a dock.

3. SAME—LAY DAYS—WHEN COMMENCE.

Where the bill of lading contains nothing to indicate a contrary intention, the stipulated lay days should be held not to begin to run as against the consignees of cargo on a general ship until the vessel has arrived at her berth, or is in actual readiness to discharge, according to her legal obligation. *Secus*, as against the charterer, or a consignee assuming all the obligations of the charter-party, or having the control of the ship.

4. SAME—CUSTOM AND USAGE.

A custom or usage to dispense with this legal obligation must be so fixed, uniform, and well understood, as to be presumed to form a part of the contract. Such a usage is not made out by evidence that in the majority of cases merely certain kinds of cargo are discharged on lighters for the mutual convenience of the consignee and the vessel, where it also appears that it is not unusual to discharge upon the dock, and that plenty of docks were available.

5. SAME—MODE OF DISCHARGING VESSEL.

The words " to be taken free from on board," in a bill of lading, do not, necessarily, mean to be taken on lighters away from the wharf.

6. SAME—CASE STATED.

The ship Petropolis having arrived with 2,090 empty petroleum barrels stowed above a cargo of iron, which by the charter-party and bill of lading were to be discharged at the same berth, was directed by the consignees of the latter to go to the Erie basin, where barrels would not then be received. The ship arrived there on May 26th, but could not reach the wharf, and moored along-side another vessel. She was unable to get a berth along-side the wharf until June 1st, and the barrels were discharged by the 4th. The bill of lading gave four lay days, and demurrage thereafter, not indicating when they commenced to run. On May 25th the vessel notified the consignee that she would be ready to discharge on the 26th, and the consignee, on the 27th, notified her to discharge the barrels on the dock if lighters were not along-side. *Held*, that the lay days, as against the respondents, did not commence until June 1st, and that no demurrage accrued.

In Admiralty.

*Beebe, Wilcox & Hobbs*, for libelant.

*E. S. Hubbe*, for respondent.

BROWN, J. This action was brought against the owners and consignees of 2,090 empty petroleum barrels, imported in the ship Petropolis, from Pillau, and consigned to the respondents in New York, to recover four days' demurrage, at the rate of £10 per day, for delay in receiving the barrels beyond the time specified in the bill of lading. The case turns partly on the construction of the bill of lading, and partly on the question whether the respondents were bound to receive the barrels on lighters instead of on the wharf.

The Petropolis had a cargo consisting mainly of iron, with the petroleum barrels stowed above it. She arrived in New York on the twenty-first day of May, 1880, and upon the request of the owner of the

iron, the major part of the cargo, went to the Erie basin to discharge, without consulting the respondents, where she arrived on May 26th, and moored along-side another vessel. She was not able to obtain a berth by the wharf until the morning of May 31st, and soon afterwards was obliged to haul out again to admit of the departure of another vessel, and did not reach the wharf again until 4 P. M. of the same day. On the following morning, June 1st, the discharge of the barrels was commenced, and completed on the afternoon of the 4th. The iron was thereafter discharged on the wharf.

The bill of lading contained upon the margin the following clause: "To be taken free from on board in four running days, or to pay £10 sterling demurrage for every day longer detained;" and in the body it is provided that the consignee should pay freight, "say one shiling sterling for every barrel taken in, with all other conditions as per charter-party, with primage and average accustomed."

The charter referred to in the bill of lading provided that the Petropolis should proceed to Pillau, and there load, not exceeding about 2,000 empty petroleum barrels, and thence proceed to New York, and deliver the same to the freighter, or his assigns, on being paid freight, "say one shilling sterling for every barrel taken in, £2 gratuity to the master. The captain has liberty to complete the vessel with rails and other cargo; the cargo to be delivered at Pillau free on the railing of the vessel, and to be discharged in the same berth where the rails are discharged. Freight payable on delivery of the cargo agreeably to the bills of lading; the cargo to be taken from along-side the said vessel at merchant's risk and expense. Four running working days are allowed for loading the barrels, and twelve running working days for discharging the whole cargo; and if detained during a longer period, he engages to pay for such detention at the rate of £10 sterling per day."

Prior to the arrival of the vessel, the respondents had sold the barrels to a purchaser who agreed to take them on arrival without delay. On May 25th, before arriving at the dock, the master of the ship gave notice to the respondents that he would be ready to discharge on the following day. On the 27th the respondents notified the captain that if no lighter was along-side, to discharge the barrels on the dock, giving them notice thereof; to which, on the same day, the agent of the vessel replied they would do so, if the respondents would obtain permission from the owners of the dock. The agent testified on the trial that after receiving the respondents' letter he had applied for permission to place the barrels on the dock and been refused; and

that many owners of docks refused to receive petroleum barrels on account of the danger of fire and its affecting their insurance; and that this application had been made before his letter to the respondents. The respondents were not notified that permission had been refused, nor did they reply to the last-named letter.

A general ship is bound to make delivery of her cargo at a wharf, or other suitable place of landing, unless otherwise provided by the bill of lading or the usage of the port. In the absence of any usage or stipulation, she may go to any suitable wharf of her own selection, and if she has on board such a cargo as cannot all be delivered at the same wharf, the burden of delivery still rests upon her, and she must go to different wharves unless she can make arrangements with the owners of the cargo to avoid that trouble. 1 Pars. Shipp. & Adm. 222; *Moody* v. *Five Hundred Thousand Laths*, 2 FED. REP. 608. In the absence of any special provision, the lay days provided in the bill of lading do not begin to run until the vessel has arrived at some usual or suitable place of discharge. *Aylward* v. *Smith*, 2 Low. 192; *Hodge* v. *N. Y. & N. H. R. R.* 46 Conn. 277; *The Grafton,* Olcott, 49; *Irzo* v. *Perkins,* 10 FED. REP. 779, and cases cited.

It has been decided, however, and such seems to be the general rule, that, as between the ship-owner and the charterer, the "arrival" of the ship is deemed complete, and the lay days begin to run from the time when the ship has arrived at the usual or designated place of discharge within the port, such as the public docks, although not able to get a berth immediately, so as to commence her discharge. *Brown* v. *Johnson,* 10 Mees. & W. 331; *Kell* v. *Anderson,* Id. 498; *Nelson* v. *Dahl,* 12 Ch. Div. 568; *Davies* v. *McVeagh,* 4 Exch. Div. 265; *Sleeper* v. *Puig,* 10 Ben. 181; Macl. Shipp. 526–532.

The libelant invokes the application of this rule from the time of the arrival of the Petropolis at the Erie Basin on the twenty-sixth of May; and if this rule is applicable to the respondents as consignees under this bill of lading, they must be held liable, although the four lay days provided by it had expired before the vessel reached her berth.

The question is one of construction of the terms of the bill of lading. As between the charterers and owners, it is just that where the stipulation is that the ship is not to be detained beyond a certain number of days in loading or unloading, the charterer who designates the place of discharge, and after arrival controls the motions of the ship, shall bear the risk of any delay in obtaining a berth at the place of his own selection; for from the time of arrival at the

place designated for discharge "the carrying voyage of the ship is over," and she is at the disposal of the charterer for the purpose of unloading. *Nelson* v. *Dahl*, 12 Ch. Div. 568, 590; *Wright* v. *New Zealand, etc., Co.* 4 Exch. Div. 165, 171; *Adams* v. *Royal M. S. S. Co.* 5 C. B. (N. S.) 492. That construction, under such circumstances, is reasonable, and presumably according to the intention of the parties.

There are several cases in the English courts where a similar rule has been applied also to consignees under the bills of lading of a general ship, (*Porteus* v. *Watney*, 3 Q. B. Div. 534; *Straker* v. *Kidd*, Id. 223; *Leer* v. *Yates*, 3 Taunt. 387; *Randall* v. *Lynch*, 2 Campb. 352; *Harman* v. *Gaudolphin*, Holt, N. P. 35;) but on examination they will all be found to turn upon the express language of the contract made by the bill of lading.

In *Leer* v. *Yates* there were several different consignees, each of whom stipulated that the goods "should be taken out in 20 days after arrival, or to pay £4 per day demurrage." The "arrival" being complete from the time of entering the docks, each consignee was held liable *in solido* upon the express contract, although the delay was partly through not getting a berth within the dock, and partly through the negligence of other consignees in not removing the superincumbent cargo.

In *Kell* v. *Anderson*, 10 Mees. & W. 498, 502, Baron PARKE observes that the case of *Leer* v. *Yates* turned entirely upon the words "after arrival," by which the parties had bound themselves. See, also, *Cross* v. *Beard*, 26 N. Y. 89. So, in *Harman* v. *Gaudolphin, supra*, the stipulation was that the consignee should "clear the goods in 14 running days after her *arrival* in port." It was held that the consignee took the risk of all delays not occasioned by the delay of the ship. In *Randall* v. *Lynch* the charter-party provided that the lay days should "continue in London from the day of reporting at the custom-house." In *Porteus* v. *Watney* (1878) the charter-party allowed "14 working days for loading and unloading, and demurrage at £35 per day." The bills of lading to various consignees provided for the delivery of goods "on paying freight for the said goods, and all other conditions as per charter-party." The defendant's goods were at the bottom of the ship; and although he was without fault and ready within the time to remove his goods, he was held liable for the delays caused solely by other consignees having goods above his, on account of the express language of the bill of lading, which adopted the terms and the liabilities of the charter-party. The embarrass-

ing' results of contracts such as these, making the several consignees virtually answerable for the faults of each other, although without fault of their own, is fully recognized and discussed in this case, as well as in that of *Leer* v. *Yates*, and the defendants were held liable, simply because the terms of the contract left no alternative. Macl. Shipp. 531.

Where the terms of the bill of lading, however, admit of a different construction, a different rule has been applied to consignees; as where it stipulates for a discharge "in the usual and customary manner," or where the time is to be reckoned "from the time of the vessel being ready to unload and in turn to deliver;" or where by the usage of the port and of the trade, the *arrival* is not deemed complete until a berth is reached, or where a discharge is to be made "according to the customs of the port," or where a certain quay is named, in which case the ship must get along-side. *Rogers* v. *Forresters*, 2 Campb. 483; *Robertson* v. *Jackson*, 2 C. B. 412, (Man., G. & S.;) *Nordon* v. *Dempsey*, 1 C. P. Div. 654; *Eleven Hundred Tons Coal*, 12 FED. REP. 185; *Postlethwaite* v. *Freeland*, 4 Exch. Div. 155; *Strahan* v. *Gabriel*, unreported, cited by BRETT, L. J., in *Nelson* v. *Dahl*, 12 Ch. Div. 589, 590.

I have found no case save that of *Dobson* v. *Droop*, 4 Car. & P. 112, in which the liability of a consignee of goods on a general ship is considered, where the bill of lading did not either expressly by its own language, or else by adopting the liabilities of the charter-party, fix or indicate the time when the lay days were to commence. In that case the ship was to be "discharged in 14 running days, or five pounds a day demurrage;" and Lord TENTERDEN held the defendant was not liable for the delay caused by the misconduct of another consignee. This case has, it is true, been referred to as overruled by those above cited. This is not, however, strictly true; since the provisions in the bill of lading were in all of those cases essentially different.

In the present case the bill of lading is substantially the same as in the case of *Dobson* v. *Droop*. It does not adopt the mere terms of the charter-party as to demurrage, as in the case of *Porteus* v. *Watney, supra,* so as to assume the liabilities of the charterer. It adopts only "all the other conditions as per charter-party," making its own different provision as to the lay days; which, therefore, supersedes the general provisions of the charter-party on that subject. It provides that the barrels are "to be taken free from on board in four running days, or to pay £10 sterling demurrage for every day longer

detained," with nothing to indicate when the lay days are to commence. In this respect it is ambiguous; and in the absence of proof of any usage settling the question, it ought to be determined in accordance with the presumed intention of the parties, to be gathered from their situation, their relations to the ship, and to the other consignees. *Raymond* v. *Tyson*, 17 How. 53, 59–62.

The same language in a charter-party imports, as the cases above cited show, a liability on the charterer from the time the "arrival" is complete at the public docks, or at the usual or designated place of discharge. As between the ship-owner and the charterer this is a reasonable construction, as I have already said, and presumably represents their intention. The object of the ship-owner is to limit and define as nearly as possible the time for which his ship is let as a whole to the charterer. The owner takes the risks of the time employed in navigation from port to port; but after arrival at the place designated for discharge, and the duties of navigation are over, he obviously intends to limit the period incident to unloading, and to be paid for any longer use of the vessel. It would be unreasonable and unjust, therefore, that the ship should bear the burden of delays caused after arrival, without her fault, in getting a berth at the dock, or at a landing designated by the charterer; and this applies also where a sole consignee is in the situation and has the powers of a charterer. *Philadelphia, etc.,* v. *Northam*, 2 Ben. 1, 4; *Sprague* v. *West*, Abb. Adm. 548. It is reasonable and just that the charterer, or the consignee, who has the control of the ship, should take the risk of such delays as are more or less subject to his own directions; and the charterer may, by the express terms of the bills of lading, protect himself against all delays on the part of the various consignees; and if the charterer means to make all the consignees like himself liable for whatsoever delays, the bill of lading should express that intent clearly, by unambiguous languge, or by adopting as in *Porteus* v. *Watney*, the liabilities of the charterer. *Wegener* v. *Smith*, 15 Com. B. 285.

The situation and relations of one of several consignees of goods on a general ship are very different from those of the charterer. He has no power, like the latter, to designate the place of discharge within the port, or to control the vessel's movements after arrival, unless there be some custom on the subject; and, in that case, custom must also dispose of the liability for delays. All that such a consignee can possibly do is to be ready to receive his goods when the vessel is ready to unload them. The different consignees have no

privity of contract with each other, and no means of protection against each other's defaults. It is unreasonable, therefore, to suppose, and it is in fact incredible, that the parties to the numerous bills of lading on a general ship intend to make all the consignees' responsible *in solido*, not merely for the delays of the vessel over which they have no control, but also for the defaults of each other in the removal of the several portions of the cargo, unless the words used in the bill of lading admit of no other construction. It is a maxim, in the interpretation of written instruments, that the construction shall be reasonable, since it is not to be supposed that the parties intended anything unreasonable or unjust, if that can be avoided. Potter, Dwarris, St. 145, 136, 130; Abb. Shipp. *250; *Raymond* v. *Tyson*, 17 How. 59–62.

The language of this bill of lading, like that in *Dobson* v. *Droop*, does not require any such unreasonable construction. It is satisfied just as fully and as naturally by a construction which limits its meaning to a "detention," by some act or default of the consignee after the vessel is ready to unload his particular goods, as by the more extended construction, which includes a "detention," from whatsoever cause, and by whose default soever, from the moment of arrival at the dock or place of discharge. The circumstances, and the relations of the charterer to the vessel and to the other consignees, make the latter construction of such general language as this bill of lading employs, the proper one in a charter-party; while the wholly different circumstances and relations of the various consignees to the vessel and to each other make the former construction the only reasonable and proper one in the case of a general ship, where there is nothing expressed to indicate the time when the lay days begin.

If, in a port like this, where there are many docks equally available for the discharge of general cargoes, a vessel may select her own dock, and then hold all the different consignees liable for demurrage during the delay in getting a berth, great abuses would be likely to arise. The vessel might select the most crowded dock for the mere purpose of multiplying her claims for demurrage; and after arrival there she would have no motive for diligence in securing a berth. On this bill of lading, therefore, I follow the principle of the ruling of Lord TENTERDEN in *Dobson* v. *Droop*, and hold that its proper construction does not make the consignee liable for delay in getting a berth after arrival at the dock or place of discharge.

If I felt compelled, however, to give the same construction and effect to these or similar words contained in the bills of lading of a,

general ship, as when contained in a charter-party, so as to hold the consignees liable for delays in obtaining a berth after arrival, still, for the reasons above referred to, and to prevent abuses, I should hold it to be incumbent upon the ship, before recovering for such delays, to prove that she used reasonable diligence in endeavoring to find the least crowded dock as a part of her primary duty to go to a proper place of discharge; and the lapse of a week, nearly double the entire lay days allowed to the respondents, as in this case, before securing a berth, without explanation or excuse, should be regarded as *prima facie* evidence that she had not gone to a proper place of discharge, and therefore was not entitled to count the lay days until she reached her berth.

The Petropolis, however, did not go to the Erie basin on her own selection, but by direction of the consignee of the iron, as owner of the major part of the cargo, for his convenience, and therefore properly at his expense for any delay in getting a berth. The case of the ship against the other consignee is not improved by this direction of the owner of the iron. For one consignee cannot, by his own directions, relieve the ship from her duty to another consignee to go to a proper place of discharge. Any usage giving the owner of the chief part of the cargo the choice of the dock is not legal beyond what is reasonable; and it is manifestly unreasonable that such a consignee should, for his own convenience, direct a ship to a crowded dock, at the expense of the other consignees, when a more suitable one for all could just as well be had. If such directions are given, and the vessel acts upon them without the concurrence of the other consignees, she must be held derelict in her duty to the latter, and therefore not entitled to count lay days against them until she reaches her berth. Nor should the other consignees be required, in consequence of such directions, to discharge otherwise than according to their obligations; or to receive their goods on lighters, when entitled to a discharge on the wharf. Lighters cannot be procured as readily as trucks; more time to get them is necessary; sometimes they cannot be got for several days, and sometimes, through ice, they cannot for a considerable time be used at all. Lay days, therefore, which are agreed upon in a bill of lading, with reference to a discharge on a wharf, cannot be equitably applied to a discharge on lighters; and hence no duty to receive on lighters can be ingrafted upon a contract having reference to a wharf.

In this case the provisions of the charter party, which, aside from demurrage, are adopted by the bill of lading, manifestly contemplate

a discharge at the wharf; for they provide that the barrels shall be discharged, not in the stream, nor while the ship is moored beside another vessel in the dock, but "from the same *berth* where the rails are discharged." The ship was to reach her berth, therefore, alongside the wharf where the rails were to be discharged before the discharge of the barrels was to commence. ·The notice that she would be ready to discharge on the 26th was, therefore, premature, for she was not ready to discharge at her *berth* until June 1st. This clause in the charter-party would also be a sufficient answer to the further contention of the libelant, that the respondents were bound by usage to receive the barrels on lighters before reaching the wharf, even if such a usage at this port were proved. Some evidence as to such a usage was given by both parties. But no fixed, well-settled, or uniform custom was made out, such as would change the legal rights or obligations of the parties, nor anything more than a practice in the majority of cases to discharge on lighters by arrangement for the mutual convenience of the parties. *The Eddy*, 5 Wall. 481; *The Paragon*, Ware, 328–330.

The requirement, that the barrels should be discharged at the same berth with the rails, also demanded that the ship should go to a dock where both would be received on the wharf, unless no such dock could be found, of which there is no evidence. Under such a clause, clearly, neither the ship nor the other consignee could select a dock where the barrels could not be put on the wharf at all, as was the fact here. For this additional reason, therefore, the vessel did not go to a proper place of discharge, if, as I find was the fact, the respondents were not by any fixed usage legally bound to receive the barrels on lighters. *Tapscot* v. *Balfour*, L. R. 8 C. P. 46. Nor, considering the few lay days allowed to the respondents, can I regard it as a reasonable construction of this stipulation that, though not legally bound to receive the barrels on lighters in the stream away from the wharf, they would do so if the owner of the iron chose to direct the vessel to a wharf where the barrels would not be received. The stipulation that the barrels should be discharged at the same berth with the rails implies, as a necessary condition, that the berth selected should be one where a discharge could be made according to the ship's legal obligation, *i. e.*, on a wharf.

If, on arrival in port, an arrangement is made for a delivery of the cargo on lighters, and either party has acted upon it, the other may doubtless be held for all legal damages occasioned by the arrangement being unfulfilled or revoked. *Irzo* v. *Perkins*, 10 FED. REP.

779. In this case the agent of the vessel testified that the respondent's clerk, on the twenty-sixth of May, called and inquired where the ship was, and where they should send lighters, and that the agent replied that she was at the Erie basin. This certainly does not amount to any agreement to receive on lighters, although it was plainly an intimation, if the clerk had authority to make it, that it was expected that the consignees or their vendee would receive the barrels in that manner. If the Petropolis had, after such an arrangement, and in reliance upon it, gone to the Erie basin, where barrels would not then be received, she might have recovered her damages for her expense and delay in subsequently going to another dock to discharge, like the Roma in the case last cited. But in this case the facts are different. The action of the the Petropolis was not affected by the interview with the clerk in any respect. She was already at the Erie basin, where she had gone without consulting the respondents, and she made no change in consequence of the clerk's inquiry, or of the notice from the respondents on the following day to discharge on the dock, and hence sustained no damages thereby.

The clause in the charter-party that the "cargo is to be taken from along-side the vessel at merchant's risk and expense," and the words of the bill of lading, "to be taken free from on board," are, I think, clauses of similar import. The witnesses were unable to state the precise meaning or intention of the latter clause. But it does not, any more than the former, on its face, import any obligation to discharge the cargo on lighters rather than on a wharf. Clauses substantially the same are not uncommon. *The Kathleen Mary*, 8 Ben. 165; *Smith* v. *Sixty Thousand, etc.*, 2 FED. REP. 396; *Moody* v. *Five Hundred Thousand Laths, etc.*, Id. 607; *Smith* v. *Sieveking*, 4 El. & Bl. 945–6; Leggett, Bills Lad. 390–396.

As the Petropolis was, therefore, bound in this case to make delivery of the barrels at some wharf, as the respondents did not waive that obligation, and are not legally chargeable for the delay in getting a berth, and as they received the barrels within four days after she got her berth and was ready to deliver the barrels, the libel should be dismissed with costs.