## THE HENRY SUTTON.[1]

## MANSON and others *v.* NEW YORK, N. H. & H. R. Co.

*(District Court, D. Connecticut.* March 16, 1886.)

1. DEMURRAGE—PLACE OF DISCHARGE NAMED IN ILL OF LADING.
    Under the bill of lading the vessel was obliged to discharge her cargo at the Consolidated docks. New Haven. As the company had several docks at New Haven, the consignee had the right to select therefrom the one that he preferred, provided that the dock selected was accessible in a reasonable time, by reasonable means.

2. SAME—DELAY CAUSED BY ACCIDENTS OF NAVIGATION.
    Under a bill of lading which requires delivery to be made at a named dock, arrival of the vessel at the dock is ordinarily a prerequisite to demurrage, and delays of the vessel within the port, for a considerable time, from accidents of navigation, without the fault of the consignee, do not require him to receive the freight at another place than that named in the bill of lading.

3. SAME—RECIPROCAL RIGHTS OF MASTER AND CONSIGNEE.
    When an accessible dock has been designated, it is the duty of the vessel to employ a tug, or to use such reasonable means as may be necessary to enable her to arrive at the place of discharge; but if a delay takes place at the request of the consignee, he takes upon himself the risks incident to change of weather, and is liable for demurrage if the discharge is not effected within the time stipulated for in the bill of lading, provided the designated dock has become inaccessible, unless by the use of unreasonable means, for an unreasonable time, and the vessel is prevented by the consignee from unloading at its accessible dock.

In Admiralty.

*John H. Whiting* and *Wm. K. Townsend,* for libelants.

*Johnson T. Platt,* for respondent.

SHIPMAN, J. This is a libel *in personam* for demurrage. On January 21, 1885, the West Virginia Central & Pittsburgh Railway Company shipped, at Baltimore, on board the schooner Henry Sutton, of which Gilbert Manson was master and managing owner, and the other libelants were co-owners, 980 tons of coal of 2,240 pounds each, to be delivered to the New York, New Haven & Hartford Railroad Company at the "Consolidated Road Docks," New Haven, for a specified freight. The said railroad company is very commonly called the "Consolidated Road."

The bill of lading contained the following provision in regard to demurrage:

"And 24 hours after the arrival at the above-named port and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted, for every hundred tons thereof, after which the cargo consignee or assignee shall pay demurrage at the rate of eight cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo, as per this bill of lading, for each and every day's detention, and *pro rata* for parts and portions of a day beyond the days above specified, until the cargo is fully discharged, which freight and demurrage shall constitute a lien upon said cargo."

[1] Reported by Theodore M. Etting, Esq., of the Philadelphia bar.

The Henry Sutton reached Morris cove, within the entrance to New Haven harbor on Friday, January 30, 1885, at 12 o'clock midnight. On January 31, 1885, at 2 o'clock P. M., the captain reported to William A. Waterbury, who was then the freight agent of the consignee:

The consignee has three docks, Belle dock, the Middle dock, and the Pocket dock, close to each other, at which coal is delivered. Belle dock is the largest. These docks are near the steam-boat docks, where large steam-boats daily land, and are upon the main channel of the harbor.

The coal on board the Henry Sutton was bought for the use of the locomotive engines of the consignee. The largest part of this class of coal is received at the Shop dock, a small wharf south-west of the passenger depot, and connected with the main channel, three-fourths of a mile distant, by an artificial channel, which has been dug out within the last five or six years, and which is about 10 feet deep at low tide, and 80 feet wide. At this wharf are facilities for rapidly discharging a cargo by day and by night. One vessel only, at a time, can lie at the wharf and be discharged. Two vessels can lie at the same time in the basin. Another portion of the coal for the engines of the consignee is delivered at a dock above the draw-bridge. A portion of the same class of coal is delivered at Belle dock.

At this time, on January 31st, the consignee had three cargoes of this class of coal in the port; one, a small cargo, on board the George Aery, which reported on January 30th, and was then discharging at Belle dock; another, on board the Crescent, which reported on January 31st, at 11 o'clock A. M.; and the third, on board the Sutton. The Wm. O. Snow was then lying light at the Shop dock, having discharged her cargo.

At the conversation on January 31st said Waterbury told Capt. Manson that he must go to the Shop dock and discharge. The captain replied that he did not think the channel was deep enough for his vessel. Waterbury thought it was. The captain replied that he would try and take his vessel there on the first tide, which would be that night. Waterbury replied that he could not take her in then, as the Crescent was to go in first, and they did not want two there at once, as they had had some trouble with two vessels in the basin at the same time. This conversation was of such importance that I think it desirable to state the reasons for the finding that it took place. Manson testifies positively that he reported to Waterbury on the 31st, was assigned to the Shop dock, and was prohibited from going there then, and is supported by George Hills. The first conversation which Waterbury remembers he says took place on February 2d, when Manson apparently knew that he had been assigned to the Shop dock. It is manifest that he had been assigned there previously, and that he knew it. The only other person who could have made the assignment was the dock-master, who testifies that he took the bill of lading on the 31st, made

an entry of the time thereon, gave the captain no directions, and that his destination was apparently understood between him and Waterbury. The assignment must have been made by Waterbury on the 31st, who merely does not remember it. It is reasonable that the conversation which Manson and Hills narrate also took place at the same time.

The Wm. O. Snow came out and the Crescent went to the Shop dock on February 1st. On the same day, about 12 o'clock noon, the Sutton was towed to the entrance of the Shop dock channel. The tides were good, and she could have gone up to the Shop dock basin. On January 31st the ice was about an inch thick in the channel. On February 1st it was broken by rains. On February 2d, and thereafter it increased in thickness, and so continued until after February 15th, and a vessel could not get to the Shop dock unless a tug-boat should make a special trip and break the ice in advance. During the first week of February, Manson attempted to contract with the manager of one of the two principal tug-boat companies to tow him to the Shop dock, but was refused, because the manager did not think it safe either for the tug or tow to make the attempt. The Crescent tried to make a contract on February 6th with a tug-boat captain, to tow her out, but was unsuccessful. She remained at the wharf, frozen in, until March 6th. From January 31st to February 15th the Sutton could easily have gone to Belle dock as the main channel was kept open by the daily line of passenger steam-boats. The owners of tug-boats refused to take her to Belle dock, because Mr. Waterbury had requested them not to do so. Capt. Manson offered to go there and tender the cargo. Mr. Waterbury forbade his coming.

The Crescent was discharged at 2:20 A. M. on Thursday, February 5th. On February 4th Waterbury notified Manson that the Crescent would be discharged on the 5th, and that he should want the Sutton on that day. On February 5th Manson saw Waterbury and told him if the Crescent got out he would go in. Waterbury replied that when the Sutton got in he would have the Crescent out. The captain declined to go in until a passage was clear, and Waterbury declined to break the ice.

I make no finding in regard to a conversation which Mr. Waterbury and others say occurred on February 2d, which was to the effect that Manson asked for a berth at the Shop dock and Waterbury told him to go up the channel, and Manson declined to go till the Crescent was out of the way, because, in view of the conversation of January 31st forbidding Manson to go up the channel, and of the fact that on February 2d Waterbury knew that the ice prohibited the vessel from going up until it was broken, and of the further fact that the condition of the ice was about the same on February 2d as on February 5th, when the Sutton could not get to the wharf by the use of reasonable means, the conversation was not, in my opinion, of importance.

The Sutton lay at the mouth of the Shop dock channel until February 15th. Then an arrangement was made between the captain and consignee by which the cargo was delivered at Belle dock to Williams, Wells & Co., who paid the freight, and sold the coal; the captain retaining all his rights to claim demurrage, and no claim of either party being waived, relinquished, or admitted.

The vessel commenced discharging on February 16th, at 1 o'clock P. M., and was discharged on February 23d, about 9:15 A. M. If demurrage is to be allowed, it commenced on February 13th at 9:12 A. M., and is due for a period of 10 days, and amounts to $784. Under the terms of the bill of lading the Sutton was obliged to discharge at that one of the docks of the consignee which the latter might designate, provided the designated dock was accessible by the use of reasonable means by the ship-owner and within a reasonable time. *Nelson* v. *Dahl*, 12 Ch. Div. 568. The selection of the place of discharge was with the consignee, and the ship-owner was obliged to use reasonable means to reach it, one of such means being the employment of a tug; but if, from physical or other causes, the place was inaccessible, unless by the use of unreasonable means or by waiting an unreasonable time, the consignee should have designated one of his wharves which was accessible and convenient for the discharge of the cargo. While this is true, it is also true that, under a bill of lading which requires delivery to be made at a named dock, arrival of the vessel at the dock is ordinarily a prerequisite to demurrage, and delays of the vessel within the port, for a considerable time, from accidents of navigation, without the fault of the consignee, do not require him to receive the freight at another place than that named in the bill of lading. *Aylward* v. *Smith*, 2 Low. 192; *Parker* v. *Winlow*, 7 El. & Bl. 942; *Bastifell* v. *Lloyd*, 1 Hurl. & C. 388; *Hodgdon* v. *Railroad Co.*, 46 Conn. 277.

At the time of the arrival of the Sutton, the Shop dock was designated, and was accessible by the aid of a tug, and could have been reached without difficulty. But the consignee requested that the vessel should not proceed to the dock, but should wait at the mouth of the channel, three-fourths of a mile distant. If she had voluntarily waited at this point, and had been frozen in, the case would present different features, but having waited there at the request of the consignee, and being unable, on the 5th, when she was notified that she would be wanted, to obtain a tug to break the ice, and being prevented by the express direction and authority of the consignee from unloading at its accessible dock, the liability of the consignee for demurrage seems to me to be complete. The accident of navigation which prevented the Sutton from reaching the Shop dock was encountered by the direction of the consignee. If that dock had been accessible by the use of reasonable means when the Crescent had unloaded, the case would have been different, but it was then inaccessible, unless by the use of unreasonable means, for an unreasonable time. The

Belle dock was accessible, but the consignee prevented the vessel from unloading there.

The facts in *Choate* v. *Meredith*, 1 Holmes, 500, bear an analogy to the facts here. In that case the consignee's wharf was inaccessible for an unduly long time by reason of ice and lack of sufficient water, whereupon the libelant took the vessel to the only accessible wharf in the port, notified the consignee, and offered to deliver the cargo, which offer was not accepted. The demurrage claimed was the same as in the bill of lading in this case. It was held that the libelant was entitled to demurrage.

There should be a decree in favor of the libelants for $784, and interest from February 23, 1885, and costs.