MANSON and others *v.* NEW YORK, N. H. & H. R. Co.

*(Circuit Court, D. Connecticut.   June 21, 1887.)*

1. DEMURRAGE—BILL OF LADING.
    Where a bill of lading designates a particular dock at the port of delivery as the place of discharge, the carrier cannot claim demurrage for detention arising from the state of the elements prior to the vessel's arrival at the particular place; but, after arrival at the place designated, the consignee takes the risk of any ordinary vicissitude, or of *vis major*, which may occur to prevent the release of the ship at the expiration of the running days.

2. SAME.
    The master of the schooner S. received on board at Baltimore a cargo of coal to be transported to New Haven, and there delivered at the "Consolidated Road Docks." The bill of lading provided that lay-days should begin to run 24 hours after arrival at New Haven, and notice thereof to the consignee, and that one day should be allowed for the discharge of each 100 tons of cargo, after which the cargo consignee or assignee should pay demurrage at the rate of eight cents a ton per day on the entire cargo until the same was fully discharged. The S. arrived January 30th, and on the 31st reported to the consignee, who directed the discharge to take place at "Shop Dock," one of the consolidated docks mentioned in the bill of lading. The entrance to this dock was through a channel about 80 feet wide. Another vessel was ordered in the channel ahead of the S. The S. was towed to the entrance of the channel, and, while waiting for the other vessel to discharge, and on February 3d, ice formed in the channel so thick that the S. could not proceed. On February 5th the consignee directed the master to proceed, but he declined unless the consignee paid for opening the channel, and offered to discharge at another dock. On the 16th the discharge, by agreement, was commenced at another dock, and was completed on the 23d. *Held,* that 10 days' demurrage, from February 13th to 23d, should be allowed; affirming the decision of the district court, 26 Fed. Rep. 923.

In Admiralty.
*William K. Townsend* and *John H. Whitney,* for libelants.
*Johnson T. Platt,* for defendants.

WALLACE, J.   This is a libel *in personam* for demurrage. The district court decreed in favor of the libelants, and the respondent has appealed. The libelants are the owners of the schooner Sutton, the master of which received on board at Baltimore a cargo of coal to be transported to the port of New Haven. By the bill of lading the master undertook to deliver the cargo to the appellant, the consignee therein named, at the "Consolidated Road Docks, New Haven." The clause in the bill of lading, as regards demurrage, is as follows:

"And 24 hours after the arrival at the above-named port, and notice thereof to the consignee named, there shall be allowed for receiving said cargo at the rate of one day, Sundays and legal holidays excepted, for every hundred tons thereof, after which the cargo, consignee, or assignee shall pay demurrage at the rate of eight cents per ton a day, Sundays and legal holidays not excepted, upon the full amount of cargo, as per this bill of lading, for each and every day's detention, and *pro rata* for parts and portions of a day, beyond the days above specified, until the cargo is fully discharged; which freight and demurrage shall constitute a lien upon said cargo."

The consignee had several docks at the port of New Haven. The Sutton arrived at New Haven harbor at midnight, January 30, 1885, and reported at 2 o'clock P. M. the next day to the agent of the consignee. This agent directed the master of the Sutton to discharge the cargo at one of the docks of the consignee called the "Shop Dock." A vessel was then lying at that dock, having just discharged her cargo. The basin in which that dock was situated was connected with the main channel of the harbor by an artificial channel of about 80 feet wide, and about 10 feet deep at low tide. The master told the agent that he would try and take his vessel there on the first tide, which would be that night. The agent replied that another vessel, the Crescent, was to go in first, and that he did not want two vessels there at the same time. On the next day the Crescent went to Shop dock, and the Sutton was towed to the entrance of the Shop-dock channel. While the Sutton was waiting there for the Crescent to be discharged and come out, and before that vessel came out, and by February 3d, ice formed in the channel of such thickness that the Sutton could not proceed; and this state of things continued until March 6th. On February 5th the consignee's agent directed the master of the Sutton to proceed and discharge his cargo at Shop dock. The master offered to take the Sutton through the channel, and discharge as requested, if the consignee would pay the expense of having a passage broken through the ice. The agent of the consignee refused to do this. The master of the Sutton refused to discharge at Shop dock, and the agent of the consignee insisted that he wanted the cargo discharged there. It would have involved a very considerable expense, especially to the libelants, to break a passage through the ice to Shop dock. At this time, and all the time after the consignee was notified of the arrival of the Sutton, Belle dock, another of the consignee's docks, was accessible, and the master of the Sutton offered to discharge his cargo there; but the consignee's agent would not consent, because the convenience of the consignee required the coal to be discharged at Shop dock. Matters remained in this situation until February 16th, when an arrangement was made between the parties by which the cargo was to be discharged at another place without waiving the rights of either, and under that arrangement the discharge was immediately begun, and was completed February 23d.

The foregoing are the essential facts upon which the case turns. Demurrage was allowed by the district court for a period of 10 days, commencing on February 13th, in the sum of $784. The appellant contends that the Sutton was under obligation to proceed to the Shop dock, that being the place of delivery designated by the consignee, and that no liability for demurrage arises because she had not completed her voyage prior to February 16th, and was not prepared to make delivery of the cargo at the proper place.

The decision of the learned district judge recognized the rule that, when a bill of lading designates a particular dock at the port of delivery where the cargo shall be discharged, the carrier can make no claim for demurrage for any detention arising from the state of the elements prior

to the arrival of the ship at the particular place. His decision was placed upon the ground that, under this bill of lading, the consignee had the right to designate which one of the several docks constituting the consolidated road docks, named in the bill of lading, should be the place of discharge, provided the one selected was accessible to the Sutton within a reasonable time, and by the use of reasonable means; and he held the consignee liable because the dock selected was at the time inaccessible, and the detention arose without fault of the carrier, and while the ship was waiting for an opportunity, pursuant to the instructions of the consignee, to get to the dock designated.

The decree below is not one of which the appellant can reasonably complain. If the libelants had appealed, they would have been entitled to recover one day's demurrage more than was allowed by the district court. The law undoubtedly is that the obligation of the carrier is not alone to carry the cargo, but is in addition to deliver it at the place of discharge in the port of destination mentioned in the bill of lading; and the consignee incurs no liability for demurrage until such delivery is made or tendered. *McIntosh* v. *Sinclair*, 11 Ir. C. L. 456; *Aylward* v. *Smith*, 2 Low. Dec. 192; *Parker* v. *Winlow*, 7 El. & Bl. 942; *Hodgdon* v. *Railroad Co.*, 46 Conn. 277. It is equally well settled that, where the bill of lading allows a given number of days to the consignee for unloading, a contract is implied on his part that, from the time when the ship is at the usual place of discharge, he will take the risk of any ordinary vicissitude which may occur to prevent the release of the ship at the expiration of the running days. *Tiis* v. *Byers*, 34 Law T. (N. S.) 526; *Randall* v. *Lynch*, 2 Camp. 352; *Cross* v. *Beard*, 26 N. Y. 85.

The place of discharge designated in this bill of lading was any one of the several docks of the consignee known as the "Consolidated Road Docks;" and there was no proof of any usage or custom by which any particular one of these docks was to be treated as the place of discharge. Under this bill of lading the consignee had the right, and it was its duty, to designate a suitable place for the discharge of the cargo within 24 hours after notice of the ship's arrival. This follows not merely from the fact that delivery of the cargo was to be made at any one of several docks belonging to the consignee, all of which ordinarily were equally convenient, or practically so, for the carrier; but because the peculiar phraseology of the demurrage clause implies that the parties to the bill of lading intended that the consignee should have 24 hours in which to select a suitable place of discharge after notice of arrival of the ship. *The Boston*, 1 Low. Dec. 464. The bill of lading thus prescribes what time is to be deemed a reasonable time on the part of the consignee in which to provide a suitable place for the discharge of the cargo, and exonerates him from liability for any delay occurring during that period without his fault; but it also imports a promise on his part that the running days in which the vessel is to be discharged shall commence at the expiration of the 24 hours. *Choate* v. *Meredith*, 1 Holmes, 500. Any detention of the ship from that time, which occurs without the fault of the carrier, is at the risk of the consignee.

The court below adopted a view more liberal to the consignee. It is plain that until February 3d the master of the Sutton was ready to deliver his cargo, and could have made delivery at any one of the docks of the consignee; but the court found, and the proofs sustain the finding, that the master of the Sutton was induced to delay proceeding to the Shop dock for the convenience of the consignee, and waited at a place as near that dock as he could get, in pursuance of the instructions of the consignee, until the ice prevented him from reaching it. He then offered to discharge at another of the docks named in the bill of lading, which was then accessible; but permission to do so was refused by the consignee. Under such circumstances it is not open to fair doubt that the consignee took the risk of any detention of the ship by *vis major* while it was waiting to get access to the Shop dock. *Tapscott* v. *Balfour*, L. R. 8 C. P. 46; *Jones* v. *Adamson*, 35 Law T. (N. S.) 287. The consignee cannot be heard to allege that the master was in fault for complying with its own instructions, or that the libelants are in any different position than they would be in if the detention of the Sutton had occurred at Shop dock after she had reached that place.

The decree of the district court is affirmed, with interest and costs.