## Case No. 1,671.

### The BOSTON.

[1 Lowell, 464.] [1]

District Court, D. Massachusetts. Aug. Term, 1870.

BILL OF LADING—PLACE OF DISCHARGE—DAMAGES FOR BREACH.

1. It seems, that the owner of the whole cargo of a vessel may order her discharge at any suitable place within the port.

2. Under the bill of lading now in use in the coal trade, the consignee has a right to choose the place of discharge.
[Cited in O'Rourke v. 221 Tons of Coal, 1 Fed. 620; Devato v. 823 Barrels of Plumbago, 20 Fed. 518.]

3. Where the consignee had indorsed such a bill of lading back to the original shipper, and the master was seasonably notified of the fact, he was bound to take the vessel to the wharf to which he was ordered by the shipper.
[Cited in Devato v. 823 Barrels of Plumbago, 20 Fed. 518.]

4. A master having failed to deliver a cargo of coal according to the terms of his contract, the vessel was libelled in the admiralty, and it appearing that since the libel was brought the shipper had replevied the coal, the assessment of damages was postponed until the replevin suit should be determined.

5. In a libel for not delivering coal according to the terms of a bill of lading, by landing it at a wrong wharf in the port of discharge: held, the measure of damages was the value of the coal less the freight and charges, although the freight had not been earned.
[Cited in Oakes v. Richardson, Case No. 10,-390; Devato v. 823 Barrels of Plumbago, 20 Fed. 513.]

6. The counsel fees of a replevin suit by the shipper to recover his coal are not to be included in the damages assessed in the action for not delivering.

[7. Cited in Manson v. New York, N. H. & H. R. Co., 31 Fed. 299, construing a demurrage clause to imply that the consignee should have 24 hours, after notice of the vessel's arrival, to select a suitable place for her discharge.]

In admiralty. The libellants, Louis J. Audenried & Company, coal merchants, doing business in Philadelphia and Boston, shipped a cargo of coal on board the schooner Boston at Philadelphia, and received a bill of lading requiring delivery at Boston to Bosworth & Hamlin or their assigns, at a freight of two dollars and twenty-five cents per ton and three cents per ton for each bridge. There was the clause lately introduced by an association of ship-owners into these contracts for carrying coal, and which has been under consideration several times in this court, that twenty-four hours after arrival at the port, and notice thereof to the consignee, the vessel should be discharged at the rate of one hundred tons per day, after which the consignee or assignee should pay demurrage. The libellants had an open contract with Bosworth & Hamlin, the consignees, for a large amount of coal to be delivered from time to time dur-

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

ing the season, and intended this cargo for them; but they were unable to receive it, and so notified the libellants, and indorsed the bill of lading to them before the arrival of the vessel. Hearing that the schooner was in the harbor of Boston, Bosworth & Hamlin sent word to the master that he was not to deliver his coal at their wharf; but he came up to the next wharf to theirs, and was again told by one of the firm that they should not take the coal, and that he must report to the libellants, which he did. The libellants thereupon ordered him to discharge at the wharf of Cook, Jordan & Morse, and this he refused to do. They then procured from the original consignees a written order of similar purport, but with no better result. Some negotiation was had between the parties, but nothing came of it, and the master, after some days, landed his cargo at the wharf to which he had first come, to be held subject to the order of the libellants on their paying freight, demurrage, and other charges, if any; and the libellants thereupon proceeded here for non-delivery of the cargo.

D. Thaxter, for libellants.
P. H. Hutchinson, for claimants.

LOWELL, District Judge. The claimants insist that the master might deliver his cargo at any suitable wharf, with notice to the consignee or his assignee, and thus fully meet the requirements of his contract; and that this was such a wharf. It is often said in the books that this is the master's whole duty, but I am of opinion that the proposition has been sometimes understood a good deal too broadly. The dictum of Mr. Justice Buller, in Hyde v. Trent & M. Nav. Co., 5 Term R. 389, 397, is that a delivery on the usual wharf will discharge the carrier. And in Chickering v. Fowler, 4 Pick. 371, the case finds that the cargo was landed at a usual wharf, and it was held that it need not be landed at the wharf of the consignee. There are cases which recognize it to be usual at this port and at others for the master of a general ship to go to a suitable wharf and notify the consignees, who are then bound to take their goods from the wharf: The Tangier [Case No. 12,265]; Cope v. Cordova, 1 Rawle, 203. But these cases have not turned on the question what was a suitable or usual wharf. This would seem to be a question of fact, and one which may be answered very differently in different cases. The law, as I understand it, is, that the master is not in general bound to transport the goods on land, but his contract is fulfilled by delivery from his ship at a proper place within the port. Still, the question is always one of delivery in the particular case, and if he has not delivered to the consignee or shipper personally, he must justify his substituted delivery: Gatliffe v. Bourne, 4 Bing. N. C. 314, 3 Man. & G. 643, 7 Man. & G. 850;

Humphreys v. Reed, 6 Whart. 435; Hemphill v. Chenie, 6 Watts & S. 62; Ostrander v. Brown, 15 Johns. 39. This he may do by showing that the delivery was in accordance with the terms of his contract, or with the usual course of trade at the port, or of the course of dealing between the same parties. Here I have not been shown any such usage. There is no evidence of what is usual or suitable in respect to cargoes of coal; but considering the heavy nature of the cargo, which makes its transportation on land very costly, I am led to doubt whether a usage to land such a cargo at a distance from the owner's wharf could be considered reasonable. In the absence of evidence of usage, I lay down the rule of law, as I did in another case (The E. H. Fittler [Case No. 4,311]), that when there are two or more wharves in the port equally convenient to the carrier, he is bound to deliver at that most convenient to the shipper, at least if he be duly and seasonably notified of such preference. And where one shipper or consignee owns the whole cargo, he has, in my opinion, the same right that a charterer would have to say where the vessel shall discharge, it being, of course, a suitable place and within the limits of the port.

This point is not of vital importance here, because this bill of lading contemplates that the consignee, and not the master, is to choose the place of delivery. I have more than once construed this new demurrage clause to mean that the owner of the coal is to have twenty-four hours after notice of the ship's arrival in which to find a berth for her discharge. This construction has not only been acquiesced in, but insisted on by the ship-owners. So the provision that the freight should be increased by each bridge that the vessel may pass through, cannot mean that the master shall have the right to disregard the shipper's wishes and go to a distant wharf through unnecessary bridges, and thus increase his freight while disobliging the other party; but that so many as the consignee or his assignee requires him to pass through shall be paid for.[2]

It was the duty, then, of the master to deliver at the wharf of Cook, Jordan & Morse, according to the order given him by the libellants within twenty-four hours after notice of his arrival, and indeed, at the very time when, in accordance with his contract, he reported to them his arrival. If he had any doubt whether they were the proper persons to deal with, it was removed by the orders and statements of the original consignees and by the indorsement of the bill of lading. He says, in his answer, that he at one time offered to go to the required wharf if the libellants would pay the towage. This they were not bound to do under the circumstances of this case, because he

---

[2] I am informed that a similar ruling as to the duty of the master was made in the replevin suit by Brigham, C. J., in the superior court.

should have gone there at once. Again, he says he at one time offered to go if they would pay him, in advance, his freight and demurrage. But they were not bound to pay freight until the goods were delivered, nor could any demurrage be due when the delay was wholly his fault. At the argument, it was urged in addition to these points, that the wharf of Cook, Jordan & Morse is not within the port of Boston. I was asked to limit the bounds of the port to the open harbor below the numerous bridges which surround the peninsula on several sides, and which are said to have changed the character of the navigation and to have imposed new and unusual burdens upon ship-owners. In this case, I need only say on this head that no evidence whatever of usage was introduced; that this is an old and well-known coal wharf within the most ancient limits of the town of Boston, and that the bill of lading provides for going through bridges.

It was said at the bar that since the pleadings were made up the libellants have taken the cargo by a writ of replevin out of the hands of the wharfinger, with whom it was left by the claimant. This being so, I cannot fairly estimate the damages in this case until that suit is in some way disposed of. Interlocutory decree for the libellants. Damages to be assessed.

At a subsequent term the cause was brought on again, and it was proved that the replevin suit had been tried to a jury, and had resulted in a verdict for the libellants with nominal damages, and that judgment had been rendered thereon and had been satisfied. The libellants now moved for damages, and proved that the coal had fallen in value about $1.25 a ton between the day it should have been delivered and the time of the service of the writ of replevin.

D. Thaxter, for the libellants.

It was suggested by the court at the former trial that the measure of damages would be the value of the goods here, deducting freight. If this be so, we can have only nominal damages. because the freight was more than the diminution in value, and as we must give credit for the goods now that we have received them, there will be nothing left to assess. We contend: 1. When a carrier misdelivers goods, or refuses to deliver to the true owner, he has forfeited his freight, and the shipper may have the goods or their full value without deduction. The distinction which reconciles all the cases is this, that mere nonfeasance is not a conversion, but misfeasance is: Sayward v. Stevens, 3 Gray, 107, 8 Gray, 215; Robinson v. Baker, 5 Cush. 137; Bowlin v. Nye, 10 Cush. 416. The case of The Cassius [Case No. 564] is consistent with the above, because there the master had earned his freight, and afterwards converted the goods.

2. The master converted our goods and we have recovered them, and are bound to give credit for the value recovered, less the expenses of the recovery: Williams v. Archer, 5 C. B. 318; Archer v. Williams, 2 Car. & K. 26; Forbes v. Parker, 16 Pick. 466; Woodham v. Gelston, 1 Johns. 134; Rice v. Nickerson, 9 Allen, 478; Add. Torts, 443. This should include counsel fees.

LOWELL, District Judge. The able argument for the libellant has failed to convince me that in an action of contract for not delivering goods in conformity with the bill of lading, the measure of damages is the value at the port of delivery, without deduction. I have used a different rule in two cases in which goods were injured by deviation and delay, namely, the value less the freight. This furnishes an indemnity, as we see in this case; for the libellants had sold the cargo in good faith, and would have realized the price, after paying the freight, if the master's contract had been fulfilled; and the exact loss which they have suffered is the price, deducting the freight. It is urged that the vessel never earned freight, and this is true; but the question here has nothing to do with that. I am not giving freight to the claimants, nor denying it to them, but ascertaining the loss to the libellants. They had the right to take their goods if they could find them, without paying freight, as indeed they have done; and by that means they would and must get more than an indemnity; but in an action for not delivering, they are entitled to an exact indemnity. It was at one time much contested whether the damages in such a case should not be the value at the place of shipment, with interest, but it has been fully settled that it is the value at the port of destination. Some of the cases do not touch the question whether it shall be the gross or the net value, but all which do mention it say it is the net value after deducting expenses; for the reason that those expenses go to make up the value. Thus, in what may be fairly called the leading case of Watkinson v. Laughton, 8 Johns. 213, where goods were embezzled by the crew, it was held that the damages were their net value, deducting freight and other charges, not, of course, as actual charges, but as the true mode of finding the exact loss sustained. This rule has been followed in Gillingham v. Dempsey, 12 Serg. & R. 188; The Cassius [supra]; Nourse v. Snow, 6 Greenl. 208; The Joshua Barker [Case No. 7,547].

A wrong-doer may often be required to give up chattels without any allowance for what has been spent upon them, and a carrier could not, perhaps, set off nor recoup freight which he had never earned; but this is not such a case. The libel is not brought for the recovery of the goods or of their value, but for the breach of a maritime contract to carry and deliver them; and though

the value of the goods is an element in the computation of damages, the real question is, what has the libellant lost? And the true answer is, what he would have had if the contract had been performed. Suppose the voyage had been from a foreign country, and the goods had been subject to duty; in estimating the damages, duties would be deducted from the value in the market here, without any regard to whether the carrier had paid duties or not; because the libellant would have been obliged to pay them to obtain the full market value of his goods, and they really go to make up that value.

It is admitted that the libellants must give credit for the net value of the coal replevied by them, but they contend that in estimating this value they may deduct the reasonable counsel fees of the replevin suit. None of the cases cited came up to this contention, and I am of opinion that they cannot be allowed. · Counsel fees are sometimes considered in estimating the damages in salvage cases even since the fee bill has prevented their being taxed as costs, and where one is bound by contract to warrant another's title, and has been duly notified to defend an action on the title and has failed to do so, these fees may be recovered. But here the suits were simply two actions for nearly the same cause, and were adversary, and probably if the claimant had required it, the libellants might have been put to their election which they would maintain. Under these facts there is no more reason for allowing the counsel fees in this case than in the replevin suit itself. The theory of the judgment in that suit was that the taxable costs would indemnify the plaintiffs. They have recovered their coal and their costs, and after giving credit for its value when replevied there is no surplus left to be assessed in this action. As the present defence is in the nature of a plea puis darrein continuance, the libellants are entitled to nominal damages, and costs. Decree for the libellants for $1 and costs.