O'ROURKE *v.* TWO HUNDRED AND TWENTY-ONE TONS OF COAL.

*(District Court, S. D. New York.* April 5, 1880.)

CONSIGNEE OF ENTIRE CARGO—PLACE OF DISCHARGE—INACCESSIBLE AND HAZARDOUS WHARF.—The consignee of an entire cargo has no right to designate, as the place of discharge within the port, a wharf which is unreasonably inconvenient, inaccessible, or extra hazardous to the vessel.

PRIVATE WHARF.—A private wharf is a proper place to discharge a cargo, where it can be used by strangers upon the payment of compensation.

TENDER—REFUSAL TO RECEIVE CARGO.—A refusal to receive cargo after due notice, and after the lapse of a reasonable time given the consignee to accept, dispenses with the necessity of a formal tender.

BILL OF LADING—EVIDENCE.—Evidence of prior conversations is inadmissible to vary the provisions of a bill of lading.

In Admiralty.

*E. D. McCarthy,*

*R. P. Lee,* for claimants.

CHOATE, J. The libellant was the owner and master of the canal boat Mary O'Rourke. On the twelfth day of December, 1877, he received on board of his canal boat 221 tons of coal, shipped by the firm of A. Pardee & Co., at Perth Amboy, N. J., and signed and delivered a bill of lading therefor, acknowledging the shipment of the coal in good order and condition, and promising to deliver the same in like good order and condition "at the port of Hackensack, (the dangers of the sea only excepted,) unto J. H. T. Banta, or to his assigns, he or they paying freight at the rate of 2½ cents per ton alongside; captain tending guy."

The same day the libellant's boat, with the coal on board, was towed up the Hackensack river and moored along side of a pier or dock on the west side of the river, a short distance below what is called the "village bridge." In that im ediate

vicinity, below the bridge, are three or more piers or docks, to which it is customary for steam tugs coming up the river to bring canal boats. The libellant having arrived at this place reported his arrival to the consignee, Mr. Banta. The consignee directed the libellant to bring his boat up to his (the consignee's) wharf to discharge, and offered to send him two men to help him pole his boat up to that wharf, which was situated within what is known as the port of Hackensack, about a mile further up the river.

The libellant denied the consignee's right to require him to do this, claiming that he had come as far as his contract required him to bring his boat, but offered to go up if the consignee would insure his boat, which the consignee refused to do. The parties, having come to no adjustment of the difference between them, then agreed to meet the next day at the office of the shippers of the coal in New York. They met there but never came to any agreement, and, after remaining at the wharf in Hackensack, where the tug left him, several days, and after notifying the consignor that he must take the coal away if the consignee did not receive it, the libellant had his boat towed down the river and brought the coal to Gowanus basin, Brooklyn; and while the cargo was there he libelled it for breach of the contract contained in the bill of lading.

The question is whether the libellant had performed his agreement by bringing the boat alongside this wharf below the bridge and offering the coal to the consignee there. If he had done all that the bill of lading required it is clear that he can maintain this suit for damages. The claimants, however, insist that he was obliged to go to the consignee's wharf, if the consignee required it, as in fact he did.

I think the rule of law is that where the vessel is chartered, or the shipment is of the entire cargo to one consignee, by bill of lading, and no place of discharge within the port is named in the contract, the charterer or consignee has the right to designate the place of discharge within the port, provided that the place so designated is a usual and proper place. *The Boston*, 1 Lowell, 464; *The E. H. Fittler*, Id. 114; *Davis* v

*Wallace,* 3 Cl. 130; *Sleeper* v. *Puig,* Dist. Ct. S. Dist. N. Y. unreported; S. C. affirmed, 8 Reporter, 357.

I think these cases recognize as a qualification of this right of this consignee to designate the place of discharge that it must be one not unreasonably inconvenient or inaccessible, or extra hazardous to the vessel. Whether or not it is so inconvenient, inaccessible, or extra hazardous, must be determined by the circumstances of the particular case.

In the present case there were certainly some inconveniences and some hazards to the libellant's boat in complying with the consignee's request to take her to his wharf to discharge her cargo. At the wharf at which she stopped she could lie safely at all stages of the tide and discharge her cargo continuously. At the consignee's wharf she could lie and discharge at high tide, but when the tide was about two-thirds down, on account of the want of depth of water, she would have to be shoved out into the river or hauled away till the tide rose again sufficiently for her to be brought back to continue her discharge. The bottom was such that it would be unsafe for a loaded boat to lie there aground. The time required for the discharge of her cargo would thereby be prolonged certainly one day, and perhaps two. To reach the consignee's wharf the libellant's boat, which drew 6 feet and 10 inches, could only cross the bar in the river above the bridge when the tide was at least half flood, and there was no practicable way of getting her up there except by poling her up on the flood-tide. Nor would it be safe to do this in the night-time. There was but one time in the day, of about three hours, when it could be safely attempted. It was late in the season, and that time of year, December 12, ice was liable to form in the river any night, and at the consignee's wharf, which was a mere bulk-head, lying along the bank of the river, the boat would, in case of ice forming while she was detained there, be in danger of being cut and sunk by the ice, and in danger of being frozen in.

The delay that would be necessarily caused by the only method of discharge practicable there, as above described, might very possibly lead to the loss of libellant's boat from this

cause. The place was not a safe one for the boat to winter. I think this necessary detention in discharging was, under the particular circumstances of the case, and considering the season of the year, not only a serious inconvenience to the vessel, but that it made that place extra hazardous. No doubt the vessel takes upon herself the usual perils of the port, and if she agrees to carry to a port, and there is not in the port any place of discharge at which she can safely lie for a continuous discharge of her cargo, she must submit to this inconvenience as being within the contract, but subject to all delays of this character necessarily incident to the port as a port. I doubt very much whether a vessel can be directed by the consignee to a place of discharge at which she cannot discharge continuously, if there are any places within the port, usually resorted to for the discharge of such cargoes, and where she can discharge her cargo, which are not open to this objection. Judge Lowell thus states the rule in the case of *The Boston*, 1 Lowell:

"In the absence of evidence of usage, I lay down the rule of law that when there are two or more wharves in the port, *equally convenient to the carrier*, he is bound to deliver at that most convenient to the shipper, if he be duly and seasonably notified of such preference."

In general, a vessel cannot be required to lie idle unless it is necessary. A continuous delivery of cargo after arrival, if practicable, is to be presumed to have been contemplated by the parties. But, however it be may in a case where this is the only inconvenience, it seems to me clear that where this necessary detention involves the vessel in a danger of loss or injury, beyond what mere delay usually does, a place subject to this objection is neither reasonably convenient nor safe within this rule of law. The poling of libellant's boat up the river to the consignee's wharf would also be a considerable inconvenience.

I am not able to find on the evidence that it would be attended by any greater danger than ordinary navigation, if the men attempting it were accustomed to the work. The consignee offered the services of his men, to be paid by libellant.

He did not offer to have her poled up at his own expense. It is unnecessary to determine the point made on the part of the libellant that this inconvenience alone, and the fact that it would require libellant to put his boat in the power of strangers, would have excused him from going to the consignee's wharf. But, under all the circumstances, I hold that the place designated was not such a proper place as the consignee has the right to designate.

It is urged, however, that the wharf at which the boat lay, and all the wharves below the bridge, were private wharves, and that the consignee had no right to go there to receive the cargo; but he testified himself that he offered to discharge there if the libellant would pay the cartage to his dock. This shows that it was a wharf which parties other than the proprietor of the wharf could use for a compensation. This made it so far a public wharf as to be a proper place to discharge.

It is also insisted that the libellant did not tender the cargo there. There may have been no formal tender, but it is evident, from the consignee's own testimony, that the libellant gave him to understand distinctly that he had arrived with his cargo at a place which he considered the end of his voyage. The only point made between the parties was whether he must, under his contract, go to the consignee's wharf, as the consignee claimed he should do. The consignee distinctly refused to receive the cargo where the boat lay, and, after waiting several days, the libellant took it away.

No other tender was necessary. Nor was the libellant bound to wait there any longer. He had the right to take his boat out of the river, where it was not safe for him to remain with her longer at that season of the year. The libellant appears to have been unduly alarmed at the risks of going up the river, and to have insisted that his boat could not safely be carried up, and to have overestimated the inconvenience and danger probably attending her lying at the consignee's wharf and discharging there; but these circumstances are immaterial.

The real question is whether, under the circumstances, his

contract required him to go further. The rights of the parties are fixed by the bill of lading, and the evidence of conversations prior to the date of it cannot have any effect to vary its provisions. The facts that the consignee's wharf was an old wharf, and that many canal boats were towed or poled up there every year, and that the consignee generally received his coal there, have no bearing on the question. His wharf was not the customary place for landing cargoes of coal at the port of Hackensack. It was, at most, but one of several such customary places; and the particular contracts made in other cases are not shown. This libellant had the right to stand on his contract, even if other persons had yielded to the demand of this consignee, under similar contracts, to bring their boats to his wharf; and the consignee could have expressly contracted to have the boat brought to his wharf if he had seen fit.

The libellant is entitled to a decree for the damages sustained by him from the refusal of the consignee to receive the cargo.

Decree for libellant, with costs, and a reference to compute damages.