DEVATO *v.* EIGHT HUNDRED AND TWENTY-THREE BARRELS OF PLUM-
BAGO, etc.

*(District Court, S. D. New York.   May 31, 1884.)*

1. BILL OF LADING—PORT OF NEW YORK—PLACE OF DELIVERY.
    The legal limits of the port of New York are such as are fixed or recognized by the statutes of the state or of the United States; and various state statutes clearly recognize a part of the western shore of Long island, including Brooklyn, as a part of the port of New York.
2. SAME—BROOKLYN.
    Under the United States Statutes Brooklyn is not a port of delivery of foreign goods, and such cargo is only legally landed there as a part of the port of New York.
3. SAME—CUSTOM AND USAGE.
    Where cargo is, by the bill of lading, to be delivered at a designated port of wide extent, without naming the particular place within the port, delivery must be made according to the established custom and usage of the port, and in that part of it customarily used in the discharge of similar goods. To ascertain this, proof of usage, either general or in particular lines of trade, is competent.
4. SAME—MAJORITY OF CONSIGNEES CONTROL.
    A usage is valid for a majority of the consignees of the cargo of a general ship to name the place of discharge; provided it be a suitable place, and within the limits ordinarily used for the discharge of similar goods.

**5. SAME –PAYMENT OF FERRIAGE OR LIGHTERAGE.**

Upon such designation by the majority, the occasional payment of small sums for ferriage or lighterage to other consignees dissatisfied with the place of landing, such payments being from policy in the rivalries of trade, and neither regular nor uniform, does not make a usage binding upon the ship to make such allowances to dissentient consignees, where the place of discharge is otherwise suitable, and according to the usage of the trade.

**6. SAME –CASE STATED.**

Where the bark G. M., from Ceylon, arrived in New York with a cargo consigned to numerous merchants, to be delivered at the port of New York, a majority of whom directed the ship to Pierrepont's stores, near Wall-street ferry, Brooklyn, and the ship discharged her cargo there, and a consignee of 823 barrels of plumbago dissented, and demanded the landing of his goods in New York city, and subsequently, under protest, took his goods from the dock in lighters, and refused to pay freight except on an allowance of $132.22, the cost of lightering across the East river, and the plumbago was thereupon libeled for the freight, *held*, (1) that Brooklyn was within the legal limits of the port of New York; (2) that Pierrepont's stores were a suitable place of landing, and the most usual place for landing such goods, as proved by the usage of the trade for a number of years past; (3) that the usage was also proved for the majority of the consignees to direct the vessel to a particular dock, and that the r direction, in this case, to Pierrepont's stores was valid and legal; (4) that no such qualification of this usage was proved as bound the ship to pay for ferriage or lighterage to consignees dissenting: and (5) that the delivery of the plumbago at Pierrepont's stores was, therefore, valid, and that the respondents were not entitled to the offset for lighterage claimed.

In Admiralty.

*Owen & Gray*, for libelants.

*Butler, Stillman & Hubbard*, for claimants.

BROWN, J. This libel was filed to recover the sum of $2,883.63, freight alleged to be due upon 823 barrels of plumbago, brought on board the bark Guiseppe Mazzini, from Colombo, in the island of Ceylon, and discharged at Pierrepont's stores, Brooklyn, immediately adjacent to the Wall-street ferry. The plumbago was shipped under a bill of lading which describes the bark as "bound for New York," and that the goods were to be "delivered at the aforesaid port of New York" on payment of freight, etc. There were numerous other consignees of different portions of the cargo, under various bills of lading, quite a number of the other shipments being also of plumbago. The vessel arrived in New York on the fifteenth of January, 1882. Prior thereto a majority of the consignees, upon the solicitation of the agents of the proprietor of Pierrepont's store, had signed requests that the bark should go to Pierrepont's stores, Brooklyn, to unload. The claimants of the plumbago in suit were not consulted. They wanted their cargo landed in New York, and on learning that the bark had gone to Brooklyn, protested against her unloading there. The plumbago, however, was put upon the pier there, and subsequently taken thence by the claimants in lighters to New York. The claimants, Gantz, Jones & Co., contend in their answer that, under the bill of lading, the ship was bound to make delivery at the city of New York; that the delivery upon the dock at Brooklyn was wrongful; that while there a portion of the plumbago was injured through exposure to snow and rain; and that the claimants were subjected to the expense of

$132.22, in the subsequent lighterage of the plumbago to New York, which they claim as an offset against any sum which may be due for freight.

· Upon the trial the claim for injury to the goods while on the pier was waived, in order that a decision might be had upon the single question concerning the right of the vessel, under such a bill of lading, to make delivery of the cargo in Brooklyn, against the protest of one of the consignees, and without compensation for lighterage across the river.

For some 30 years past there has existed at this port a controversy, or something in the nature of a controversy, between ship-owners and importers as to the right of a vessel to make delivery of cargo consigned to "the port of New York" on the adjacent shores of Brooklyn, Jersey City, or Hoboken. The evidence shows that it began some 30 or 35 years ago, about which time some of the steamship lines began to go to Jersey City. Complaint was immediately made by the merchants in regard to that practice, and some compensation was paid for the extra expense of ferriage. This liability was soon avoided by an alteration of the terms of the bills of lading so as to give liberty to discharge at Jersey City; and several lines now provide generally for an option to discharge at Jersey City, Hoboken, or New York. About the same time commodious warehouses began to be erected in Brooklyn, which now extend almost continuously from Fulton ferry to below Hamilton ferry, on the Brooklyn side. These warehouses, with the docks to which they are adjacent, furnish superior facilities for the ready handling and storage of cargo; and during the last 25 years they have been more and more used for storing goods not intended for immediate consumption. In certain lines of business, the East India trade particularly, a large majority of the cargoes of late years have come to be discharged at the Brooklyn stores; and this tendency has lately been still further increased by the erection of the Brooklyn bridge, as the vessels engaged in that trade are mostly unable to go above the bridge without housing their topmasts. During the last five years, as the evidence shows, almost all the vessels from Colombo and Ceylon have discharged at Brooklyn.

Some 15 or 20 witnesses upon each side have been examined in reference to the custom of delivery. The witnesses on the part of the respondents are, for the most part, merchants or persons identified in interest with importers. Some of them, however, are entirely impartial, and have been familiar with the controversy on this subject for 25 years or upwards, and one of them has been frequently called on to arbitrate upon differences and claims for damage arising through deliveries in Brooklyn. The respondents' witnesses all testify that the practice of delivering in Brooklyn, so far as it has been the practice to unload there under bills of lading of this description, has always been more or less protested against, and a constant subject of claim for compensation on the part of those merchants who

desired their goods to be landed in New York. In a few instances the cost of lighterage has been paid; but, generally, the only compensation allowed, where any was given, was the ferry charges for trucks employed to cart the goods to New York.

On the part of the libelants, while such claims are admitted to have been made to some extent by persons who wanted their goods in New York, it is contended that such complaints are now much less frequent than formerly; that they never amounted to much, and always came from only a very small proportion of the consignees; that no payments for lighterage were known; and that the occasional sums paid for ferriage were paid from policy, in the competitions of trade, or, in a few instances, to avoid litigation, and were so small in amount as not to be worth contending for; while quite a number of the witnesses had never heard of any such objections, or any claims for compensation at all. Many witnesses for the libelants testify to the practice of late years of landing nearly all the cargoes from Ceylon at Brooklyn, as above stated; and also to the general practice of delivering cargoes at any dock in New York or Brooklyn selected by a majority of the consignees.

The first ground of defense is that a delivery at Brooklyn is not a fulfillment of the contract contained in this bill of lading, because the bill of lading describes the vessel as "bound for New York," and makes the goods deliverable "at the aforesaid port of New York." If this contention is sound, no freight was earned. *The Boston*, 1 Low. 64. This contention, however, cannot prevail, for the Brooklyn wharves are clearly within the legal limits of the "port of New York," and hence within the possible limits of the port, as commercially understood.

1. The legal limits of the port of New York must be held to be such as are fixed or recognized by the statutes of the state or the United States. No statute of the United States defines these limits with strictness. By section 2535, the state, for the purposes of the collection of the revenue, is divided into 10 collection districts, the second of which is the "district of the city of New York," comprising "all the waters and shores of the state of New York, and of the counties of Hudson and Bergen, in the state of New Jersey, not included in other districts" in which New York is made "the port of entry;" and 10 other towns and cities between Newburgh and Troy, inclusive, as well as Cold Spring and Port Jefferson, on Long island, are made "ports of delivery;" while Jersey City is made "a port of entry and delivery, with an assistant collector to act under the collector at New York." By section 2536 the revenue officers are required to "reside at the port of New York," excepting one assistant collector, "who shall reside at Jersey City." Section 2770 requires every vessel arriving from a foreign port to make entry of ship and cargo at one of the designated ports of entry, and prohibits the unloading of cargo elsewhere than at one of the designated ports of entry or delivery. The

second collection district, therefore, of which New York is the port of entry, extends from Sandy Hook to Troy, on the Hudson, and embraces the west end of Long island, including Brooklyn. New York, as "a port of entry," is clearly not co-extensive with the whole collection district, since this district embraces not only Jersey City, which is made a distinct port of entry and delivery, but also 12 other designated "ports of delivery." The unloading of goods from a foreign port at any other place than a designated port of entry or delivery is illegal, (section 2770; *U. S.* v. *Hayward,* 2 Gall. 510, 511,) and as Brooklyn is not a designated port of delivery, unless it were included in the port of New York as a port of entry, the unloading of any foreign goods at Brooklyn would be illegal. The long practice, however, of landing foreign goods there under the authority of the collector should be deemed conclusive evidence that Brooklyn, by common understanding, is included within the port of New York as a port of entry. In ordinary commercial usage, also, Brooklyn is not recognized, I think, in foreign commerce as a distinct port, but only as an adjunct of the port of New York. As I have said, foreign goods cannot be legally landed there at all except as a part of this port; and in foreign bills of lading, when Brooklyn is referred to, it is more usually, I think, by the names of its docks only, as a part of the port of New York, and without the mention of Brooklyn *eo nomine.* In *Carsanego* v. *Wheeler,* 16 Fed. Rep. 248, the ship was to proceed from Plymouth, England, to New York, "only Atlantic dock," *i. e.,* to Brooklyn, as a recognized part of the port of New York, though Brooklyn was not named; and in *Irzo* v. *Perkins,* 10 Fed. Rep. 779, under a bill of lading making the goods deliverable at the port of New York, the vessel, by consent of all the consignees, also went to Atlantic dock, Brooklyn, to discharge on lighters; and such cases are very frequent.

Various statutes of the state of New York indicate more precisely the limits of the port of New York for various maritime purposes. By the act of March 30, 1855, c. 121, commissioners were appointed for the preservation of the *harbor* of New York from encroachments," who were empowered "to cause the necessary surveys of the *said harbor,* and to ascertain whether, in reference to the present and probable future commerce of the cities of New York *and Brooklyn,* any further extension of piers, etc., into the *said harbor* ought to be allowed; and to recommend the establishment of such exterior lines in different parts of the *said harbor,* opposite and along the water fronts of the cities of New York and Brooklyn, the county of Kings and county of Richmond, beyond which no erection should be permitted." By the act of April 16, 1857, it was made unlawful to throw into the waters of "the *port* of New York below Spuyten Duyvel creek, on the Hudson river, or below Throg's point, on the East river, or in the bay, inside of Sandy Hook," any cinders or ashes, etc. Many of the sections of this act (sections 1, 3, 4, 5, 6, 10, 11) obviously apply to the piers

and bulk-heads of Brooklyn as belonging to "the port of New York." By the act of April 17, 1857, *c.* 763, "the bulk-head line and pier line, adjacent to the *shores of the port of New York*," are declared to be as thereto ore recommended by the commissioners, embracing "from a point one mile north of Spuyten Duyvel creek, thence southerly to the entrance, and along the north shores of Spuyten Duyvel creek and Harlem river, and easterly along the north shore of the East river to Throg's Neck; also from the entrance to Little Neck bay, in the county of Queens, westerly *along the south shore of the East river*, including Flushing and Gowanus bays and Newtown creek, to the westerly end of Coney island." The laws regulating "the pilotage of the *port* of New York" evidently contemplate the same territorial extent. See act of June 28, 1853, *c.* 467; Laws of April 3, 1857, *c.* 243. The same is true of the act establishing and regulating "the board of port wardens of the *port* of New York." By the act of April 14, 1857, *c.* 405, this board consists of nine members, "one of whom shall be a resident of the city of Brooklyn." So, also, the act concerning "the captain of the port and harbor-masters of the *port* of New York," (act of May 22, 1862, *c.* 487,) evidently includes the same extended territorial jurisdiction. Section 8 of the act last cited provides that "each of the said harbor-masters shall remain in and perform the duties assigned to him by the captain of the port, and shall not absent himself from the cities of New York or Brooklyn without his permission."

In view of these various statutory regulations defining the limits of the port of New York, in reference to subjects so intimately connected with commerce and navigation, as well as the frequent recognition of the Brooklyn docks in foreign bills of lading as a part of this port, it can not be held that Brooklyn is outside of the limits of the port of New York, so as to render a delivery of cargo there necessarily a non-fulfillment of a contract to deliver at the port of New York.

2. It does not follow, however, that a delivery of cargo is necessarily a good delivery because within the legal limits of the port. Such is not the meaning or intention of the bill of lading. No one would seriously contend that under a bill of lading like this goods consigned to a merchant in New York city could be lawfully delivered at Spuyten Duyvel, some 13 miles above the Battery, at the mere option of the captain, because Spuyten Duyvel is within the geographical limits of the city and port of New York, or at Throg's Neck, or at Sandy Hook, because those places are also within the legal limits of the port.

A bill of lading is a commercial document, to be interpreted according to the usages of commerce. A port, in the commercial sense, and by the most ancient definitions, is an inclosed place where vessels lade or unlade goods for export or import. "*Portus est locus conclusus quo importantur et unde exportantur merces; idem et statio dicitur conclusus ac firmate.*" Pardessus, Lois Mar. tit. 1, p. 179. "A station (anchorage) is also so called when inclosed and made safe."

The port is not any place within the geographical limits of the same name where ships might load and unload, but where they in fact do so, *i. e.*, where they are accustomed to do so. Commercially considered, a port is a place where vessels are in the habit of loading or unloading goods; and the limits of the port, as respects a delivery under the bill of lading, turn purely upon the question of fact, within what limit ships and merchants have been accustomed to receive and deliver cargo consigned to the port designated, without any necessary regard to geographical or political divisions, or·to police or statutory regulations. Consignees of goods at a designated port have a right to expect a delivery of their goods according to the established custom and usage of the port, and in that part of the port customarily used for the discharge of such goods; and the vessel is bound, and has a right, to make delivery accordingly. Abb. Shipp. †378; *Vose* v. *Allen*, 3 Blatchf. 289; *The Grafton*, 1 Blatchf. 176; *Gatliffe* v. *Bourne*, 4 Bing. N. C. 314, 329; *Cargo ex Argos*, L. R. 5 Priv. C. 134, 160; *Irzo* v. *Perkins*, 10 FED. REP. 779.

Where the commerce of a port is increasing rapidly, the limits within which goods are deliverable must necessarily be gradually enlarged. The direction in which these limits shall extend will be determined by considerations of convenience and economy. Before the docks and piers along the lower part of New York became inconveniently crowded, and no greater convenience, economy, or dispatch were afforded at Brooklyn, no general practice of delivering cargo there, except by consent, could be deemed rightful, or in accordance with the custom of the port. But the lower part of the city has long since become incapable of accommodating the shipping of the port; and the opposite shore of Brooklyn evidently furnished, in part, the readiest means for the necessary additional accommodations. The 12 lower blocks on the East river front, embracing half the distance from the Battery to the bridge, have, for more than 25 years past, been devoted by the state statutes to·special uses which exclude ordinary foreign commerce. See act of April 13, 1857, c. 367. The other docks, moreover, in the lower part of the city, are so largely appropriated for various ferries, steam-ship lines, and to special branches of trade, that comparatively few remain available for the accommodation of miscellaneous foreign shipping. While the limits of the port within which goods were usually unladen were, from necessity, therefore, continually pushing further up the East and Hudson rivers, it was impossible that the natural advantages of Brooklyn, from its proximity to the lower part of the city, and its easy approach, should not be seized and applied to the same uses.

It matters little how the appropriation of new localities for the delivery of goods originates. It is usually, doubtless, by the consent or agreement of parties, prompted by considerations of convenience and economy; such, as I am informed, has recently taken place as regards the new cotton docks and warehouses at Staten island.

But what begins in special agreement may, ere long, end in a prevailing custom, either in general trade or in a particular traffic; and the question in any particular case must be, whether the practice of landing at such parts of the port has become so general and so established as to be fairly and reasonably entitled to be recognized as within those limits wherein the merchants of the port ordinarily receive, and vessels ordinarily discharge, such goods. To show his, proof of usage is necessarily received, and such is its appropriate office. *Ostrander* v. *Brown*, 15 Johns. 39, 42; *The Reeside*, 2 Sumn. 569.

In *Bradstreet* v. *Heron*, Abb. Adm. 209, it was held by BETTS, J., under a usage proved in that case, and upon a defense precisely similar to the defense in this case, that a delivery of goods at quarantine, during the quarantine season, was a compliance with a contract of the bill of lading to deliver at "the port of New York." The same, also, in substance, was held in the case of *Gracie* v. *Marine Ins. Co.* 8 Cranch. 75.

In his case, I think, the weight of evidence undoubtedly shows that the docks and warehouses of Brooklyn opposite the lower part of New York have been so long and so generally used for the delivery and storage of goods consigned to this port, especially in the trade from Ceylon and the East Indies, as to be entitled to recognition, not merely as one of the customary places of discharge within the port, but, in fact, as the chief place for the discharge of such goods. I am satisfied, from the evidence, that a great majority of the merchants in that trade have long since found it to be for their convenience and their interest to have their goods delivered at the stores there rather than in New York city. So largely has this part of Brooklyn been employed in that trade, under bills of lading like this, that if these docks and warehouses were to be suddenly destroyed, and incapable of being restored to use, the changes made necessary, especially in the eastern trade, would amount almost to a revolution. And, if this be so, it is clear that the use of these docks and warehouses, as at present established, is an integral and essential part of the established commerce of the port, for the customary delivery and receipt of goods.

In the case of a general ship it is not to be expected that all the consignees will be equally accommodated by a single place of landing. The most that can be expected is to accommodate the majority of the consignees; and if the vessel lands at a suitable wharf within the customary limits for the discharge of similar goods, and in accordance with the request of a majority of the consignees, as in this case, her obligation is performed, though the minority might find some other place of discharge more convenient.

It was not claimed in this case that the landing at Pierrepont's stores was unreasonable on account of its distance; or that the respondents would have been subjected to less expense for cartage or lighterage had the bark landed at any available pier on the New York

shore. What New York docks were available for the discharge of this bark does not appear. Had she gone to some of the up-town wharves within the present ordinary limits for discharging goods, as she might have done had there been no direction by the majority of the consignees, there is no evidence to show, and it cannot be assumed, that the respondents would have been subjected to any less expense for truckage or lighterage than they incurred through the delivery at Brooklyn.

The prevailing usage for a number of years past, to discharge nearly all cargoes like the present at Brooklyn, is not seriously denied; the respondent's evidence, on the whole, confirms it. The point they contend for is, rather, that this practice is illegitimate and illegal; and that those who do not assent to such delivery are, therefore, entitled to compensation, either for lighterage or ferriage, to New York; in other words, the respondents, while admitting the prevailing practice of discharging at Brooklyn, seek to ingraft upon it either a legal obligation, or a custom on the part of the ship, to make compensation to those who dissent. Apart from any usage to make compensation, I cannot hold the vessel legally bound to do so, for the reasons above stated. The evidence, while showing the payment, in many instances during past years, of small sums, fails, in my judgment, to establish any such general practice of this kind as amounts to a usage obligatory on the ship to allow such offsets to the comparative few who object to the landing in Brooklyn. The superior convenience of Brooklyn over the up-town docks, to which vessels might go for discharge, and the presumably less expense of landing at the former, in the absence of any proof on the subject, require the claim for lighterage and ferriage on account of landing in Brooklyn to be regarded as resting on technical grounds, rather than as meritorious and substantial. When this bark arrived in New York she was, therefore, in my judgment, entitled to consider the docks of Brooklyn as available places for the discharge of her cargo, as well as those upon the New York shore; and, in selecting the one shore or the other, she was subject only to the rules ordinarily applicable between different places of delivery in the same port. Where there are several wharves equally convenient to the carrier, he is bound to deliver at that most convenient to the shipper, if seasonably notified of such preference; and, where the consignees are numerous, a usage for the majority to name the place of discharge is valid, if the place named be suitable, and within the limits where such cargo is ordinarily landed. *The Boston*, 1 Low. 464, 466; *The E. H. Fittler*, Id. 114; 1 Pars. Shipp. & Adm. 233, note.

In the case of *Blossom* v. *Smith*, 3 Blatchf. 316, Nelson, J., held valid an established usage of trade less obviously reasonable than this; namely, that the largest single consignee of a cargo of naval stores, such as resin, turpentine, etc., might select a yard in Brooklyn at which the whole cargo should be delivered, and that the other

consign es must accept delivery there. The case, as reported, does not state the form of the bill of lading; but on examining the record I find that the bill of lading in that case was of the usual form, describing the vessel as bound for New York, and the cargo to be delivered to the consignees "at the port of New York," as in this case. Such cargo was not allowed to be stored in the city of New York; and the same is true in regard to part of the cargo of the bark in the present case.

The usage proved in this case, for the majority to name the place of landing, was not controverted. The same usage in other lines of trade has been repeatedly proved before me, and acted on in other cases without serious question. The bark in this case went to Pierrepont's stores, as I have already said, upon the request of a majority of the consignees. Though this did not suit the respondents, it must be assumed that it did better suit the majority than a delivery on the New York shore; and as this was within the legal limits of the port, and was also a suitable dock where such cargo is proved to have been long customarily discharged, I cannot hold that the bark, in going there in accordance with the request of the majority, failed in its duty under the bill of lading, or violated any legal right of the respondents; and I cannot, therefore, allow them the offset claimed.

The libelant is therefore entitled to a decree for $2,883.63, the amount of freight claimed, with interest and costs.