MITCHELL et al. v. A CARGO OF LUMBER.

(District Court, E. D. New York. July 10, 1902.)

1. SHIPPING—CHARTER PARTY—PORT OF DISCHARGE.
Where a ship was chartered from Halifax to the port of New York, she cannot be compelled to discharge at New Rochelle, on Long Island Sound; that place being neither within the port of New York geographically, nor as defined by Greater New York Charter 1901, § 864, etc.

2. SAME—WAIVER.
Where consignees of a cargo illegally required the consignee of a vessel to unload at a certain point, which he refused to do, the fact that he also refused because his vessel would not lie afloat at that place did not constitute a waiver of his claim that the cargo consignees had no right under the charter to compel a delivery there.

Benedict & Benedict (R. D. Benedict, of counsel), for libelants.
Rounds & Dillingham (Ralph S. Rounds, of counsel), for claimant.

THOMAS, District Judge. On the 7th of November, 1901, the brigantine Atrato, some 98 feet in length, and drawing 12½ feet, laden with lumber, arrived at Hunter's point, in the port of New York, on a voyage from Halifax, after touching at City Island. On this day Walford, the ship's consignee, asked Stetson, Cutler & Redman, the consignees of the cargo, for discharging orders, and was informed that such orders could not be given at that time. On the afternoon of the same day the cargo was sold, deliverable at New Rochelle. On or about the 8th of November, the captain of the Atrato called upon Stetson, Cutler & Redman, and was informed by Cutler that the cargo had been sold at New Rochelle. The captain stated that he had heard that there was not a good bottom at the New Rochelle dock, upon which Cutler informed him that he was confusing the intended berth with the other dock at New Rochelle, and that the bottom was absolutely good. The question of paying the extra towage and pilotage came up, and Cutler stated that, as the vessel had come from City Island to New York upon Walford's direction, Walford should pay these expenses, but as the captain went out of the door, Cutler said to him that he would do what was right. From this time forward the consignees of the cargo and ship were in discord, and debated their rights, and what they would and would not do, and what they could and could not be compelled to do; the consignee of the ship insisting that by right he could not be forced to discharge at New Rochelle, and that he would not discharge there, unless a safe berth was guarantied and towage and pilotage paid, while the consignees of the cargo asserted the right to order the vessel to that point, but expressed no withdrawal of their claim that Walford should bear the expenses of towage and pilotage until the afternoon of November 12th. On November 11th Walford wrote a letter to the consignees of the cargo, stating that he had directed the captain to investigate the New Rochelle dock, and inclosed a bill for demurrage for one day. Again, on November 12th, he wrote the consignees that the vessel would be discharged at Erie

Basin, beginning the 13th. About 4 o'clock in the afternoon of the 12th, the consignees of the cargo caused a letter to be delivered to Walford, for which he receipted, in which, through their counsel, Rounds & Dillingham, they stated that the discharge must be at New Rochelle; that "they are willing to pay any extra expense that may properly arise in connection with the discharge of said schooner in accordance with their direction"; and that the discharge at Erie Basin, or any place other than Mahlstedt's dock, New Rochelle, would be at the risk of the ship. The discharge began at Erie Basin on November 13th, and was completed. The present action is for the freight, and the defense is breach of the contract of carriage.

The proposed berth at New Rochelle has a bottom of soft mud, several feet deep. There are no rocks, and nothing to injure a sound vessel, unless, perchance, a stray brick or stone mixed with the mud. The water is six or eight feet deep at low water. Approaching the channel the depth is about six feet, and the water rises to about nine feet. The depth of the water in the channel depends on the direction of the wind. With the westerly wind that had of late prevailed the depth of the water was decreased. Vessels drawing 12½ feet and over frequently discharge at this dock, but no vessel can discharge there without being aground a portion of the time, and such is the case with the majority of the lumber docks in the city of New York. Most lumber vessels have straight bottoms, but the Atrato is shaped with a sharper keel, and would not lie as evenly as a round-bottomed vessel, unless she settled down into the soft mud. The evidence tends to show that vessels as sharp as the Atrato do lie aground safely while discharging. It is probable that she, if in good order, could have lain aground at the New Rochelle dock without injury. The extent of that injury is not clear, and the evidence touching it is too meager to permit a definite conclusion. The consignees of the cargo evidently expected to sell the same at New Rochelle, and hoped to have a report from the vessel at City Island, which is near New Rochelle. Had a report been made from that point, there would have been no question of extra pilotage or towage back to New Rochelle, but the consignee of the ship was not informed that there was any such desire on the part of the consignee of the cargo, and, as the ship was chartered for New York, there was no reason why she should not have come forward to that point. Nevertheless, this situation caused the irritation and disagreement.

One of the principal questions to be decided is whether a ship laden with lumber, chartered from Halifax to the port of New York, may be ordered to New Rochelle for discharge. New Rochelle is on the Sound. It is neither within the port of New York geographically, nor as defined in section 864 of the charter of New York of 1901, or at an earlier time. See Laws 1897, c. 378, § 864; Consol. Act 1882, c. 15, tit. 3, § 803; Id. c. 15, tits. 2, 3, §§ 758, 760. Vessels laden with lumber usually come through the Sound to the East river, and it is the practice without exception, yet not always without protest, for vessels, upon being ordered so to do, to go to New Rochelle and discharge; but in such case the consignee of the

cargo always pays the extra towage or pilotage. This practice indicates a compliance with the wishes of the consignees of the cargo, to whom the vessels must look for business, but it does not establish that a vessel bound to the port of New York must, pursuant to its contract of carriage, after her arrival there, go back through the Gate, and out again into the Sound, to a point beyond the limits of the port, for the purpose of discharge. The very practice shows that the vessel goes, not by reason of the primary contractual obligation; otherwise the extra towage or pilotage would not be paid. If the vessel were bound to deliver at New Rochelle pursuant to her charter, such concession would not be made to the ship. Nevertheless, whatever the motive, constraint, or compulsion, the custom is to go upon payment of extra expenses; but the practice does not enlarge the port of New York, nor change the terms of the contract. The following findings are justified by the evidence: (1) The berth at New Rochelle was safe for sound vessels. Whether for a vessel injured, and in the condition of the Atrato, is beyond present conclusion. (2) Walford refused to go unless he could have the safety of his vessel guaranteed in her berth, and her towage and pilotage paid; each and every of which demands were at the earlier time refused by the consignees, and the payment of towage and pilotage only acceded to, in the language quoted on the 12th, after the vessel had gone to Erie Basin for discharge. (3) The claimant had no contractual right to order the vessel to New Rochelle for discharge. The decision of Judge Brown in Devato v. 823 Barrels of Plumbago (D. C.) 20 Fed. 513, sustains the holding that New Rochelle is not within the limits of the port, as recognized by the state. (4) The claimant is not relieved from this illegal position taken by them, even though it should appear that Walford refused, among other things, to go because his vessel could not lie afloat at that place, as he did contemporaneously claim that there was no legal right to send the vessel there, and evidently he did not intend to relinquish his legal rights save on the terms stated. (5) It does not satisfactorily appear that Walford refused to discharge at any berth in the port of New York where he could not lie afloat. He probably stated that such was his right, but he was ordered to no other berth, and any abstract discussion of his right in that regard is not material.

The libelants should have a decree.