## Case No. 11,730.

### REYNOLDS et al. v. The JOSEPH.

[2 Hughes, 58.] [1]

#### Circuit Court, E. D. Virginia. May, 1877.

CHARTER PARTY — MANNER OF LOADING — SHIP-ROOM—COMPENSATION—DRAFT—MASTER.

1. The master of a ship has control of the subject of loading her cargo, and may forbid, for sailors' reasons, its being placed above decks; though he thereby violate the stipulations of the charter-party: but an admiralty court will decree compensation to the charterers for loss of ship-room thus occasioned, against the ship.

2. So, a master may, for good sailors' reasons, keep a larger quantity of ballast in his ship's hold than the charter-party allows; but the court will compensate the charterer for the ship-room thus lost.

3. If the charter-party stipulates that the master shall sign a draft on the consignees of the cargo in favor of the charterers for a specific part of the freight due upon the cargo, the master has no right to refuse his signature on the excuse that demurrage is due him; certainly not in any case where the charterers have claims for disbursements and other dues in excess of the demurrage claimed; and the admiralty court will require him to sign the draft.

Libel in admiralty.

The new ship Joseph, of Maitland, Nova Scotia, H. D. McArthur, master, arrived at Norfolk on the 1st day of November, 1876, for cotton for Liverpool. She came in ballast, having 400 tons of stone in her hold. She came under charter-party to W. D. Reynolds & Bro. Her register shows a tonnage of 1,565 tons; of which 1,542 are for freight, and 23 tons reserved for the uses of the steamer. The charter-party, among other things, provides: That the whole of the vessel, except cabin, deck, and necessary room for the crew and the storage of sails, cables, and provisions, shall be at the sole use and disposal of the charterer.

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

That freight shall be at the rate of 35 shillings and 6 pence per registered ton; except that the vessel shall retain not exceeding 250 tons of stone ballast. That 40 lay-days shall be allowed for loading. That detention beyond that period by fault of the charterers shall entitle the ship to demurrage at the rate of £25 per day. That the charter shall commence when the vessel is ready to receive cargo and notice of the fact is given to the charterers. That bills of lading shall be signed as presented on (cotton) press receipts; any difference to be settled before the vessel sails; if in favor of vessel, in cash; if in favor of the charterers, by draft of captain on his consignees, payable 10 days after arrival at Liverpool. And that the master is to have a lien on the cargo for freight and demurrage.

On the 2d November the ship went across the harbor from Norfolk to Gosport, and discharged ballast without the use of steam or horse power, for 10 hours, employing 15 to 17 hands. The master claims that 150 tons were put off; but it is alleged by the charterers that not more than 50 tons were actually discharged, and that 350 tons were retained and are still in the ship; an excess of 100 tons over the contract quantity, displacing 200 bales of cotton. The ship returned to Norfolk early on the morning of the 3d of November, and immediate notice was given by her master to the charterers that she was ready to receive her cargo. The charterers' stevedore, Mr. Donald, went aboard, and states that finding the ship out of trim, he was engaged two days in adjusting the ballast so as to properly trim her. The loading was partially commenced on the 4th November, and was substantially completed on the 14th December; though a number of bales were put in on the 15th, and one bale on the 16th. During the latter days of the loading the cargo was put in very slowly, and during the whole period of the work there was more or less interruption, owing to the wharves being crowded with cotton, and to the difficulty of finding the bales intended for this ship. No cotton was permitted by the master to be placed above the main deck, except 8 bales in a small house which he built for them. There was room in the ship's house on the poop for 90 bales; and this space, as well as the alley ways, was included in the tonnage measurement of the vessel; but no cotton was allowed by the master to be put there; the reason he assigned for his refusal being that the door of the house was by three inches too small for the passage of a bale of cotton. His real reason seems to have been that his ship was already too much down in the water in her stern; for it was stated in the evidence that the Joseph was built for the cotton trade, and if so, the widening of the door would have the better fitted her for this special service. There was also considerable room for cotton on deck. It was stated in evi-

dence that in cases where the charterers of ships provide that freight should be paid for by the pound of cotton, masters are liberal in allowing cotton to be put above deck; but that, where as in this case, the charter was for freight by the lump sum, measured by the registered tonnage of the vessel, masters are very illiberal in allowing cotton to be put on deck. The Joseph being a new ship, bound on her first voyage, her master was unwilling to incumber her deck with cargo. On the 12th December, and on each succeeding day till the 17th inclusive, the master gave written notice of his claim for demurrage. On the 18th December the clearing papers of the ship were obtained from the custom-house, and on the afternoon of that day the master went to the counting-room of the charterers for the purpose of closing up his business with them. It had then been ascertained that the whole freight of the shipment amounted to £4,653. 0s. 3d.; that the amount due the ship was £2,737. 1s.; and that the difference for which the master should draw in favor of the charterers, payable ten days after arrival, was £1,915. 19s. 3d. The charterers had disbursed for the ship on order of the master what now appears to have amounted to $2,973.08; and what Mr. W. D. Reynolds then told the master was as much as $2,500. Neither of these amounts was disputed by the master on that day, and they still remain undisputed. The master was some time in the counting-room, and occupied himself with examining the bills of lading and making computation. While there, Mr. Reynolds presented him for signature a draft for the excess of freight due his firm per charter-party, £1,915. 19s. 3d. in amount, which the master refused to sign, claiming to be paid or allowed his demurrage before doing so. Mr. Reynolds reminded him that his own claim for disbursements considerably exceeded the demurrage claimed for five days, but the master still refused to sign the draft. Both of the two men became exasperated over the matter, and nothing further has been done up to this hearing in the direction of a settlement. On the 20th December the charterers filed their libel in this court, praying that the master may be required to sign the draft due them, that their disbursements may be made good to them, and that compensation or damages may be awarded them for the loss of ship-room for 290 bales of cotton, which they were entitled to and were refused.

Charles Sharp and Richard Walke, for libellants.

W. H. C. Ellis, for the ship and master.

HUGHES, District Judge. The amount of the draft due to the charterers, and the amount of the disbursements made by them, are not disputed, and the only questions open for adjudication, are: 1st. Whether demurrage is due, and how much? 2d. Whether damages are due for the refusal of the master to take cotton, and how much? and, 3d. Whether, under the circumstances of this case, the master had a right to refuse the draft due for the difference of freight, and what are the consequences of his refusal, in respect to costs and damages?

1. I think it is clear from the evidence that the long period of more than 40 days consumed in loading the vessel was owing to the delay occasioned by the crowded condition of the wharves and the time consumed in finding and extricating the bales belonging to the lots which were intended for this ship. It seems that in the early stages of loading a vessel, 600 bales may be put on in a day. At the rate of only 200 bales a day, this vessel could have been loaded in 30 days, whereas, more than 40 were consumed, and in some of the days less than 100 bales were put aboard. This delay must have been the fault of the charterers. I do not think, however, that both the 3d and 4th days of November should be counted. The ship had gone over to Gosport in ballast, well trimmed. The ballast had been taken out from the most accessible places in the vessel, most or all of it from some one position. The taking it out in this manner of necessity left the ship out of trim, and when she came over to the Norfolk wharf next day, Mr. Donald naturally found that this state of things would require to be corrected before he could begin the work of loading. I shall not, therefore, include the 3d of November in the lay-days. It is true that the custom of the port would exclude this day, but the charter-party does not recognize the first and last days of loading as one day, and special contracts always override custom. I must hold that the lay-days commenced on the 4th November and ended on the night of the 13th December. The demurrage days up to the time of the refusal of the master to sign the draft for excess of freight, would be from the 13th to the 18th inclusive, or five days.

2. I come next to the matter of ballast and the master's refusal of ship-room for additional cotton. The truth seems to be that the agent of the ship-owners provided for too small an amount of ballast in the charter-party. The weight of the testimony is that 250 tons was not a sufficient quantity for this particular ship. The master sought to correct this difficulty by indirection. I do not suppose that any impartial person who heard the evidence on the subject can believe that 150, or even 100 tons of ballast, were taken from the Joseph on the 2d November. The testimony of experts is, that only from 55 to 80 tons could have been taken out by 17 hands in 10 hours. Mr. Donald testifies that in his opinion 350 tons were left in the hold, and from his great experience and known character, I have the highest respect for his opinion and confidence in his judgment. I feel bound to believe that somewhere about 350 tons of ballast were left in the hold. In abundant liberality, however, I will deduct from this

figure 20 tons, and conclude that there was an excess of only 80 tons left in the ship, which displaces 160 bales of cotton. This gives $720 damages to the charterer. As to the loss of room elsewhere in the ship, it seems that the space in the house is included in the tonnage measurement of the vessel, and also the space included in the alley-ways. This was a ship built for the cotton-trade and chartered, in the present case, principally for a cargo of cotton. The master feared that putting cotton in the house would sink the aft part of his ship too deep in the water, and refused to let cotton go into the house. I think he had a right to refuse; and in the uncertainty of the evidence on the subject, I do not feel that I can allow damages on this score.

3. I come now to the subject of the master's refusal to sign the draft for freight due the charterers. Such drafts are among the most important of the financial instruments required for moving cotton from its places of production to its ultimate markets. In the present instance the draft covers every charge of handling except of the mere carriage of the cargo from Norfolk to Liverpool, including the cost of bringing it from Memphis and other places in the cotton region by railroad here. It is the duty of all men engaged in commerce to facilitate its operations by every means in their power. They show themselves very unworthy of their calling when they needlessly obstruct those operations. Commerce exacts caution, but abhors obstructiveness. The master of a ship has no right to refuse the signing of such a draft as the one under consideration, as a means of compelling the allowance even of a just claim for demurrage of an amount wholly disproportionated to that of the draft. He has other remedies for the satisfaction of claims of this character, without resorting to an expedient which may affect not only the interests of his immediate charterers, but of the many third persons who are usually connected with such drafts as this. Such a practice would be intolerable, and can find no favor or countenance in an admiralty court. Consignors are usually men of ample responsibility, and the masters of vessels have always an instant remedy by libel in personam against their charterers on the instance side of this court for their claims to demurrage. In the present case the draft due was for about $10,000. The master's claim for demurrage, as preferred by himself, was only for $625. He also owed his charterers for cash disbursements the large amount of $2,973.08. And they had an unascertained claim against the ship besides for a large loss of ship-room denied them by the master. His refusal, therefore, to sign the draft on Liverpool for an amount which he did not then and does not now dispute, was illegal and unjustifiable, and he thereby rendered his ship liable to this libel and to the costs of this proceeding.

A decree was given requiring the master to sign the draft; also requiring payment to the charterers of $2,973.08 for disbursements and of $720 for loss of ship-room; and in favor of the master for $625 as demurrage, and requiring the costs of this suit to be paid by the ship, amounting to $82.97.