### 593.  PENDLETON BROTHERS *v.* ATLANTIC LUMBER COMPANY.

1. It is error to grant a nonsuit if a verdict would be authorized for any amount of a plaintiff's demand, where the nature of the facts proved corresponds with the case laid in the petition. A nonsuit should not be awarded, even though evidence be introduced in behalf of the plaintiff which is vague and contradictory, if a recovery for any amount, no matter how small, may be authorized by any reasonable inference which may be drawn by the jury from any of the testimony. The grant of a nonsuit is a matter of law. The grant of a new trial is discretionary. A nonsuit should not be granted if a plaintiff has proved his case as

laid, even though in the same case a new trial might very properly be granted.

2. Under the provisions of section 4 of the act of Congress approved February 13, 1893, the master of a vessel engaged by charter-party for the transportation of a cargo of lumber is not authorized to refuse to sign bills of lading for the consignor because a demand for demurrage, claimed to be due his vessel, is not paid.

(a) Consequently, a claim for demurrage for delay in clearing a port, caused by the efforts of the master of the ship to collect another claim for demurrage, even though the latter be just, is not chargeable to the charterers, nor collectible by law.

(b) A recovery of the stipulated demurrage upon this ground of the plaintiffs' petition is precluded in this case by the terms of the charter-party.

Action for breach of contract, from city court of Brunswick— Judge Gale. May 7, 1907.

Argued October 30, 1907.—Decided February 24, 1908.

*Ernest Dart,* for plaintiffs.

*Crovatt & Whitfield,* for defendant.

RUSSELL, J. The plaintiffs in error brought a petition in the city court of Brunswick, claiming that the Atlantic Lumber Company is indebted to them, for the breach of a charter-party or contract of shipment, made and entered into between the plaintiffs and the Atlantic Lumber Company, a certain sum stipulated in the charter-party. In the first place, the suit sought to recover the stipulated damages for delay in loading the vessel, whereby the loading was not completed within the time allowed and limited by the charter-party (it being alleged that the delay was due to the fault of the defendant, and that such delay amounted to three and one half days), the indebtedness thereby amounting, at $40 per day (the sum stipulated in the charter-party), to $140. The plaintiffs also claimed that a second item, of $480, was due by the defendant, by reason of a breach of the charter-party, in that, after the loading was completed, the vessel was detained for a period of twelve days (at $40 a day) by the failure of the defendant to clear the vessel. The plaintiffs allege that the first item is due to the failure of the defendant, the Atlantic Lumber Company, to furnish the cargo to the vessel within the time allowed, alongside and within reach of the vessel's tackle. The demurrage due under the second item, as contended for by the plaintiffs, was caused by the refusal of the defendant to allow the master of the vessel to sign bills of lading, with the claim for the

first item above mentioned entered upon the bills of lading, and clear the vessel from the custom house upon bills of lading thus noted, with the claim for demurrage. At the conclusion of the plaintiffs' testimony, the judge of the city court granted a nonsuit and dismissed the plaintiffs' action; and exception is taken to this judgment.

Upon review of the evidence, we are satisfied that the court erred in this ruling. There was evidence in behalf of the plaintiffs which would have authorized a finding in their favor. Neither the fact that there was evidence, coming from a witness introduced by the plaintiffs, which would have authorized a finding for the defendant as to the first item of demurrage, which was the basis of the plaintiffs' suit, nor the fact that the second item of $480, claimed by the plaintiffs, is not recoverable by law, would authorize a judgment of nonsuit. The plaintiffs had proved their claim as laid, and thereby had escaped liability for nonsuit, even though they might not be entitled to a verdict, under proper instructions by the court, or even if, after the jury should have rendered a verdict in their favor, it would be proper for the court to grant a new trial. Where there is sufficient evidence to prove the plaintiff's case as laid, it is error to grant a nonsuit. *Helvingston* v. *Macon County,* 103 *Ga.* 107 (29 S. E. 596) ; *Kelly* v. *Strouse,* 116 *Ga.* 898 (43 S. E. 280) ; *S., F. & W. Ry. Co.* v. *Ladson,* 114 *Ga.* 762 (40 S. E. 699). And a plaintiff who has introduced evidence enough to sustain a recovery for some amount, though not the full amount claimed, should not be nonsuited. *Philpot* v. *Chattanooga R. Co.,* 114 *Ga.* 295 (40 S. E. 266) ; *Howard* v. *Dayton Coal Co.,* 94 *Ga.* 416 (20 S. E. 336) ; *Bloom* v. *Americus Grocery Co.,* 116 *Ga.* 784 (43 S. E. 54). A partial nonsuit is unknown to the law. In our view of the case the plaintiffs were not entitled to recover the second item of liquidated damages claimed for demurrage, but may, if the jury should see proper to believe certain testimony introduced by them, be entitled to a verdict for the first item, of $140. If the second item had been the only cause of action, the court would have been justified in granting a nonsuit; but, for the reason just above stated, the court erred in not submitting the case to the jury and allowing them to construe the testimony adduced upon the first item of demurrage, for which the plaintiffs claimed the sum of $40 per day, under the contract.

The charter party, a copy of which was admitted in evidence without objection, is as follows:

"This charter party, made and concluded upon in the city of New York, this 29th day of May in the year one thousand nine hundred and five, between Pendleton Brothers, agents of the brig 'Jennie Hulbert,' of New York, of the burden of 419 tons or thereabouts, now lying in the harbor of New York, of the first part, and the Atlantic Lumber Company, of the second part, witnesseth: that the said party of the first part agrees on the freighting and chartering of the whole of said vessel (with the exception of the cabin, and necessary room for the crew and stowage of provisions, sails, and cables), or sufficient room for the cargo hereinafter mentioned, unto the said party of the second part, for a voyage from the port of Brunswick, Ga., to Cardenas, Cuba, on the following conditions and terms:—The said vessel shall be tight, staunch, strong, and in every way fitted for such a voyage, and receive on board during the voyage the merchandise hereinafter mentioned, and no goods or merchandise shall be laden on board otherwise than from the said party of the second part, or their agent, without consent expressed in writing, and no lumber to be cut. The said party of the second part doth engage to provide and furnish to the said vessel a full and complete cargo, under and upon deck, of resawed pine lumber or boards, but not exceeding 325M feet. Charterers have privilege of shipping three spars, each not over 75 feet long, freight to be $10.00 each, and same to be loaded by charterers free of expense to vessel. The said party of the second part agrees to pay the said party of the first part, or agent, for the charter of freight of said vessel, as follows: $6.50 per thousand superficial feet board measure delivered. Freight payable upon proper delivery of cargo at port of discharge, in United States currency or its equivalent, without discount or commission. Vessel's draft not to exceed fifteen feet when loaded. It is agreed, that thirty thousand feet per running lay day, Sundays and legal holidays excepted, shall be allowed for loading the vessel, commencing from the time the vessel is ready to receive cargo and the captain reports himself so prepared, and cargo to be received at port of discharge as fast as the master can deliver same in suitable hours and weather, not exceeding thirty thousand per day. And for each and every day's detention by default of the

party of the second part or their agent forty dollars, United States currency, per day, day by day, shall be paid by the party of the second part, or their agent, to the party of the first part or his agent. The cargo or cargoes to be received and delivered alongside within reach of vessel's tackles. Vessel to employ charterer's stevedore for loading, provided that rate is not higher than that charged by other responsible stevedores. Vessel to haul to wharf or anchorage designated by charterers or their agents to load and discharge, who have privilege of moving her afterwards by paying additional towage. Captain to sign bills of lading as required by charterers, without prejudice to this charter party, but at not less than chartered rates. It is understood that this vessel is now at New York and shall .proceed with all possible dispatch in ballast to enter upon this charter. The act of God, restraints of rulers and princes, public enemies, fire, flood, draughts, strikes, combinations, or any extraordinary occurrence beyond control of either party, and all and every other dangers, and accidents of the seas, rivers, and navigation, of whatsoever nature or kind, during said voyage, always mutually excepted. A commission of five per cent. upon the gross amount of this charter and demurrage is due and payable to James E. Ward & Co., upon the. signing hereof, vessel lost or not lost, charter cancelled or uncancelled. To the true and faithful performance of this charter we, the said parties, do here bind ourselves, our heirs, executors, administrators, and assigns, each to the other in the penal sum of the estimated amount of charter. In witness whereof we hereunto set our hands the day and year first above written." Signed by the parties.

"New York, N. Y., July 5, 1905. It is agreed that in consideration of charterers furnishing a full and complete cargo, in which there is to be 100 M feet of kiln-dried boards, that vessel agrees to take all lumber in excess of 325 M feet, at the rate of $5.50 per M feet, all other conditions of charter party to remain as stated.

Pendleton Bros."

The charter-party afforded the evidence that the plaintiffs would be entitled to $40 a day for every day's detention caused by the fault of the Atlantic Lumber Company or its agent, and that the cargo of lumber was to be delivered alongside within reach of the vessel's tackles, and that thirty thousand feet per running lay day was allowed for loading the vessel. Capt. Donald Wright, who

was the master of the brig, testified, in accordance with the allegations of the petition, that the Atlantic Lumber Company owed Pendleton Brothers $620 for demurrage while loading, and for detention of the brig after loading, by not clearing from the custom-house the cargo shipped by them. He testified that the vessel was not loaded and dispatched according to the terms of the charter-party. He assigned the delay of the vessel, so far as the loading was concerned, to the delay of the shippers in delivering the lumber to the vessel, and also moving her to different loading berths, and not having a berth clear for the brig. He testified that he began loading on the morning of July 1, and finished July 20, at 8:30 a.m.; and that the amount of the cargo was 342,203 superficial feet, including the measurement of the spar. There were three Sundays and one legal holiday, July 4, between the day when the loading began and when it was completed, which were deducted, as was also a portion of July 20, on which day the work was finished. This left 15 days consumed in loading the vessel. According to the contract, at the rate of thirty thousand feet of lumber per day, the vessel should have been loaded in eleven and one-half days. The witness further testified, that the three and a half days demurrage, amounting to $140, was due, because the brig should have been loaded in that much less time than she was loaded, and that it was the shipper's fault that she was not so loaded, because the charterers did not deliver the brig's cargo in time within reach of her tackle. He testified, that, while at some times the cargo was delivered alongside the vessel and within reach of her tackle, "several times the stevedore's men had to go and bring the lumber from away off," and the stevedore had to supply extra men at times for the purpose of bringing the lumber within reach of the vessel's tackle, which was but 20 feet from the ship's side, the tackle not reaching further than that distance. He testified, that there was no providential hindrance which materially delayed the loading of the ship's cargo; that such showers as fell were of brief duration, and the men could have started to work as soon as they were over, if enough lumber had been there to keep the men at work steadily; that the brig was moved twice, and that at the Atlantic Lumber Company's docks the brig had such a bad berth that it was impossible to get into a berth without moving certain schooners, and this occasioned unnecessary delay.

We think this testimony certainly allowed the plaintiffs to go to the jury on the claim for demurrage for delay in loading caused by the defendant; and if the jury believed the testimony of the witness Wright to be the truth, the plaintiffs would be entitled to a judgment for the $140 demurrage claimed in the first item of the plaintiff's suit, or such lesser amount as the jury might find to be proportioned to the time lost in loading. The case is not altered because the plaintiffs introduced another witness, whose testimony is vague and uncertain, or because the testimony of this second witness is contradictory of the testimony delivered by the witness Wright. It is for the jury to determine which of the two witnesses is entitled to preference, where there is conflict or contradiction, and it was not the province of the judge to pass upon the credibility of either witness. The fact that the testimony of the witness Jackson (whose testimony should be construed most strongly against the plaintiffs who introduced him) would authorize a verdict for the defendant does not alter the case. The comparative credibility of the witnesses is still an issue of fact. For this reason we think the court erred in granting a nonsuit.

As we have already held, the court would not have erred in awarding a nonsuit if the plaintiffs' case had depended entirely upon the demurrage claimed for delay after the cargo was loaded. The plaintiffs are not entitled to recover upon this item of alleged indebtedness arising from a breach of the contract. The plaintiffs' claim is that they are entitled to $480 for twelve days delay caused by the defendant, after the ship's cargo was loaded and the brig was ready to clear the port of Brunswick. The law requires that the shipper's manifest be delivered to the custom-house authorities before the shipper clears and leaves the port; otherwise the vessel can not clear. While there may be dispute as to other facts in the case, it appears to be undisputed that the only reason why the charterers refused to give the shipper's manifest to the master of the ship was because the master would not sign a bill of lading unless they either paid the $140, demurrage claimed, or indorsed on the bill of lading the amount of demurrage claimed to be due the vessel. Captain Wright, testifying upon this subject, said: "There were twelve days delay on account of the shippers not clearing the cargo from the custom-house and refusing to pay the demurrage already due. I offered to sign bills of lading under

protest, or to have inserted in the bill of lading the amount claimed by me to be due the vessel; to which the shippers would not agree; and they refused to deliver the shipper's manifest to the custom-house, although repeatedly asked by me to do so. My vessel finally cleared the port of Brunswick and sailed away on the 2d of August. I did not leave before, because of the action of the shippers up to the time of clearing from the custom-house. . . I demanded my shipper's manifest, and the shippers refused to give it to me, because I would not sign a bill of lading to suit the shippers, without them either paying the demurrage due or indorsing on the bill of lading the amount claimed by the vessel." This action of the captain of the vessel was wholly unwarranted, and the consequent delay was not due to the shippers, but to the alter ego of the owners of the vessel. The charter-party required the master of the vessel to sign bills of lading as required by the charterers, without prejudice to the charter-party; and when he refused to sign such bills of lading he violated the charter-party, and the defendant properly refused to deliver the manifest. This violation of the terms of the charter-party is enough of itself to defeat any recovery on the second item of the plaintiffs' claim, which depended upon the 12 days delay after the vessel was loaded. But if the charter-party had been silent as to this stipulation, it would still have been the duty of the master to sign and deliver the bills of lading without the notation or entry thereon, required by him as a condition precedent to signing the bills.

Section 4 of the act of Congress of February 13, 1893 (27 Stat. c. 105, U. S. Comp. St. 1901, p. 2947), entitled "An act referring to navigation of vessels, bills of lading, and to certain obligations, duties and rights in connection with carriage of property," known as "the Harter act," provides " that it shall be the duty of the owner or owners, master or agent of any vessel transporting merchandise or property from or between ports of the United States and foreign ports, to issue to shippers of any lawful merchandise a bill of lading or shipping document, stating, among other things, the marks necessary for identification, number of packages or quantity, stating whether it be carrier's or shipper's weight, and apparent order or condition of such merchandise .or property delivered to and received by the owner, master or agent of the vessel for transportation, and such document shall be prima facie evidence

46

of the receipt of the merchandise therein described." This section does not apply to live animals, and does not modify or repeal §§4281, 1482, and 4283 of the Revised Statutes of the United States (U. S. Comp. St. 1901, pp. 2942, 1034, 2943), but is controlling in its application to a cargo of lumber, which is the subject of shipment in this case. The duties of a master in such cases have several times been defined by the Federal courts, and it has uniformly been held that the duty of the master or owner of the vessel to furnish a bill of lading is imperative, and not subject to conditions or counterclaims. In case No. 14011, 23 Fed. Cases, 1167 (In re 393 Tons of Guano), the exact point was raised, and it was held, that the master was not justified in refusing to sign bills of lading; and for that reason the owners could not claim demurrage during the time of such refusal. In that case, the bark Nicaragua was chartered for a voyage from New York to Surrano Cay. Part of the libelant's claim arose out of delay in discharging the cargo in New York. It appears that the master refused, in Surrano Cay, to sign a bill of lading for the cargo, and again refused after the vessel arrived in New York, because the charterers refused to assent to the demurrage charged by the vessel in Surrano Cay. Some days were lost in New York, in an effort to adjust this claim for demurrage. Commenting on these facts, Benedict, J., says: "The claim of the master that the demurrage should be agreed to before the bill of lading was signed had no foundation in law. The master was bound to sign the bill of lading, without reference to his claim for demurrage, and so long as he wrongfully withheld from the consignee the bill of lading, which was necessary to enable him to enter the cargo and to obtain a permit to discharge it, the discharge was prevented by the master of the ship, and for that delay he can not hold the charterer liable." The demurrage charged in that case was for delay which prevented a discharge, while in the instant case the refusal to sign the bill of lading prevented a clearance of the ship; but the principle is the same.

In Reynolds *v.* The Joseph, 20 Fed. Cas. 621, the charter-party, among other things, provided, that bills of lading should be signed as presented on (cotton) press receipts, any difference to be settled before the ship sails; if in favor of the vessel, in cash; if in favor of the charterers, by draft of the captain on his consignees,

payable ten days after arrival at Liverpool. The draft due when the vessel was loaded was for about $10,000. The master's claim for demurrage was about $625, and he owed the charterers, for cash disbursements, about $2,900. When the one of the charterers, Reynolds, presented the master with a draft, he refused to sign it, claiming that he should be paid or allowed his demurrage before doing so. The charterers filed a libel praying that the master be required to sign the draft, and for certain damages. Passing upon this portion of the case, Hughes, J., held as follows: "I come now to the subject of the master's refusal to sign the draft for freight due the charterers. Such drafts are among the most important of the financial instruments required for moving cotton from its places of production to its ultimate markets. In the present instance the draft covers every charge of handling except of the mere carriage of the cargo from Norfolk to Liverpool. It is the duty of all men engaged in commerce to facilitate its operations by every means in their power. Commerce exacts caution, but abhors obstructiveness. The master of a ship has no right to refuse the signing of such a draft as the one under consideration, as a means of compelling the allowance even of a just claim for demurrage of an amount wholly disproportionated to that of the draft. He has other remedies for the satisfaction of claims of this character, without resorting to an expedient which may affect not only the interest of his immediate charterers, but of the many third persons who are usually connected with such drafts as this. Such a practice would be intolerable, and can find no favor or countenance in an admiralty court." A decree was given requiring the master to sign the draft.. The same public policy which is referred to by Judge Hughes in connection with drafts applies to bills of lading, which are subsequently assigned or transferred, and form the basis for a credit in behalf of the holders; and it was upon this broad ground, no doubt, that the act of Congress of 1893, to which we have referred, was based.

In Sleeper v. Puig, 22 Fed. Cas. 318, case No. 12940, in which a vessel was chartered from New York to Santa Cruz, and thence to Havana, the master of the ship filed a libel containing a charge for demurrage, which included a delay from April 24 to May 3, at $35 a day. One of the clauses of the charter-party was, "in case the vessel is longer detained by said party of the second part, or

their agents, a demurrage is to be paid the vessel's agent, at the rate of thirty-five silver dollars a day, for every day so detained." It appeared in the case that the delay in sailing, from April 24 to May 3, was caused by reason of a dispute between the master of the ship and the consignees as to the settlement of the ship's account. In delivering the opinion, Judge Choate said: "As to the delay from the 24th of April to the 2d of May, it appears not to be within the stipulation of the charter-party as to demurrage. The ship was not, during this period, detained by the consignees, but by the master himself. . . If the master thinks it for the interest of his owner to stay in port for the purpose of settling a dispute with the consignees, he may properly do so, but I do not see how he can charge the damage caused by the loss of time in the use of the ship to the consignees as demurrage. If the consignees refuse to pay a balance due to the ship, the owner can recover interest from the time it became due and should have been paid, but the voyage is ended, and there can be no demurrage for such delay."

The time consumed in a dispute *after the loading* is ended would, it seems to us, be governed by the same principle as that consumed *after the voyage* is ended, which was the fact in the case just above cited. We have, therefore, no hesitation in holding that the owner of the vessel had no right in law to recover as demurrage the $40 per day for the twelve days which were spent by the master in endeavoring to procure from the charterers a manifest which he could have obtained at once by giving them a bill of lading in accordance with section 4 of the act of 1893 to which we have heretofore referred, and thereafter proceeding, in some proper way, to enforce his claim for the demurrage for the time lost in loading the ship.

We reverse the judgment of the lower court in ordering a nonsuit, solely upon the ground that the evidence in behalf of the plaintiffs would authorize some recovery as to the demurrage claimed in the first item. It is not essential, in order for the plaintiffs' case to resist a nonsuit, that they should prove the exact amount of loss alleged in the petition to be due to the breach of the contract. For instance, if the petition alleged four and a half days, and the proof satisfied the jury that the ship lost two and a fourth days, the plaintiffs would be entitled to recover the stipulated

amount per day for the lesser number of days; but the variance between the proof and the petition in the respect instanced would not authorize a nonsuit. *Philpot* v. *Chattanooga Ry. Co.,* supra; *Holcomb* v. *Richmond & Danville R. Co.,* 78 *Ga.* 776 (3 S. E. 755). It would also be far more just to allow the jury to determine, by inference from the testimony, the proper amount of time which should be deducted from the plaintiffs' claim on account of the little showers referred to, than to hold that the indefinite reference to this subject (which is wholly defensive) should subject the plaintiffs to a nonsuit. "We are not aware of any decision of this court or any other that holds that a plaintiff is to be nonsuited or dismissed because he fails to prove every allegation in his declaration or petition. If he makes out a case that will entitle him to recover, that is sufficient." *Garrett* v. *Morris,* 104 *Ga.* 88 (30 S. E. 685).

The lower court perhaps granted a nonsuit because some of the evidence in behalf of the plaintiffs was vague and contradictory; for it has several times been held that if the plaintiff's evidence is contradictory and uncertain, the court, upon motion for nonsuit, should construe the evidence more strongly against the plaintiff. It must be borne in mind, however, that in this case two witnesses testified for the plaintiff, instead of merely the plaintiff himself, as in the case of *Farmer* v. *Davenport,* 118 *Ga.* 289 (45 S. E. 244), in which the ruling above referred to was made. In the present case the testimony of Capt. Wright makes a plain case for the plaintiffs, except that perhaps, under his testimony, there should be a deduction for a portion of the day (mentioned as one half of a day), which the witness said he thought proper to deduct, out of abundant justice to the defendants; and if this is deducted by the jury upon the trial, of course the amount of the plaintiffs' recovery would be reduced to that extent. As held in *Ray* v. *Green,* 113 *Ga.* 920 (39 S. E. 470), if the plaintiff introduce any witness whose testimony is sufficient to establish the allegations of the petition, it is error to grant a nonsuit.

*Judgment reversed.*